**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JIMMY ROSS, <br><br> Plaintiff, <br><br> v. <br><br> THE UNIVERSITY OF CHICAGO, an Illinois Corporation, UCHICAGO ARGONNE, LLC, Fire Chief GEORGE HYLAND, individually and in his Official Capacity, and Fireman RICHARD KARA, individually and in his Official Capacity, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) No. 18-CV-4200 <br> ) <br> ) Jeffrey T. Gilbert <br> ) Magistrate Judge <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jimmy Ross ("Ross") has sued Defendants University of Chicago ("University of Chicago"), UChicago Argonne, LLC ("UChicago Argonne"), and Fire Chief George Hyland ("Hyland") and Firefighter Richard Kara ("Kara"), individually and in their official capacities. Ross alleges causes of action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 *et seq.*, and under Illinois common law. Ross alleges Defendants discriminated against him based on his race and age, subjected him to a hostile work environment, and retaliated against him after he reported incidents of discrimination internally. Ross also has sued Kara for intentional infliction of emotional distress ("IIED") and UChicago Argonne for negligent retention and on a respondeat superior theory.

Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final

judgment. *See* [ECF No. 21.] This matter is before the Court on Defendant University of Chicago's Motion to Dismiss for Failure to State a Claim [ECF No. 12] and Defendants UChicago Argonne's and Hyland's Motion to Dismiss for Failure to State a Claim [ECF No. 16] both pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, Defendant University of Chicago's Motion to Dismiss [ECF No. 12] is granted without prejudice and Defendants UChicago Argonne's and Hyland's Motion to Dismiss [ECF No. 16] is granted without prejudice. If he wishes to do so, Plaintiff is given leave to file an amended complaint within the next 45 days, or by January 25, 2019, but only if he can do so consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

The following facts are taken from Ross's complaint. *See* [ECF No. 1] (hereafter cited as "Compl. ¶ __").[1] Ross is currently employed by UChicago Argonne in its fire department as a battalion chief. (Compl. ¶¶ 18, 20.) Ross began working for UChicago Argonne in February of 1997 as a firefighter and was promoted to battalion chief in February of 2010. (Compl. ¶¶ 18, 20.) Ross is the only African-American employee of UChicago Argonne's fire department out of twenty-six employees. (Compl. ¶ 21.)

In 2013, firefighter Kara began treating Ross inappropriately by making racial comments and at one point hanging a black-faced puppet in Ross's locker. (Compl. ¶ 25.) Ross immediately reported Kara's actions to the human resources department and Kara was given a five-shift suspension and two-year probation. (Compl. ¶ 26.) Following Kara's discipline, then Fire Chief Patterson promised Ross that Kara would never work on Ross's shift. (Compl. ¶ 27.) In addition,

---

[1] These facts are taken as true in the context of Defendants' Motions to Dismiss. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (Holding that in evaluating a complaint's sufficiency, "we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the party's] favor.")

Patterson ordered that if Kara wished to swap shifts with another firefighter, he had to receive explicit authorization from the Fire Chief. (Compl. ¶ 28.)

In 2016, Patterson retired, and Hyland was appointed as the new Fire Chief. (Compl. ¶ 30.) In February 2017, approximately ten months after Hyland's promotion, Kara effectuated a trade onto one of Ross's shifts and said to him, "let the games begin." (Compl. ¶ 31.) Kara has continued to harass Ross and trade shifts to ensure that he is on Ross's shift. (Compl. ¶ 32). In March 2017, Hyland advised Ross that he would support Ross's decision to deny Kara's trades onto his shifts in light of the seriousness of the 2013 incident. (Compl. ¶ 33.) Since their conversation in March 2017, however, Hyland has taken no action to prevent Kara from trading onto Ross's shifts. (Compl. ¶ 35.)

In or around March 2017, Kara accused Ross of not ordering the Maltese Cross for his Class A uniform even though the order had been placed and none of the firefighters had received their crosses yet. (Compl. ¶ 36.) In August 2017, Ross denied a request by Kara to trade shifts that would have resulted in Kara working on Ross's shift. (Compl. ¶ 37.) UChicago Argonne's operational bulletin, "Gen-3," outlines the process for fire department personnel to voluntarily exchange scheduled work time. (Compl. ¶ 29.) Any changes in an employee's scheduled work time are to be approved or disapproved by the officer-in-charge. (Compl. ¶ 29.) Hyland subsequently advised Ross that his desire not to work with Kara was not a sufficient operational reason to deny a shift trade request and told Ross that he was not authorized to deny trade requests unless there was a legitimate operational reason for the denial. (Compl. ¶ 37.) Ross feels threatened by Kara when he works with him. (Compl. ¶ 38.)

Ross has been using his sick time to avoid working the same shift as Kara. (Compl. ¶ 38.) As of January 1, 2018, Ross had lost 120 hours of sick time to avoid working with Kara. (*Id.*)

Hyland warned Ross in December of 2017 that if he continued using his sick time to avoid working with Kara, he would receive "corrective action." (Compl. ¶ 39.) On April 7, 2018 Hyland accused Ross of not entering payroll for two firefighters and advised Ross that he was no longer responsible for personnel lockers or firefighter's clothing and gear. (Compl. ¶ 40.) Since the inception of these events, Ross has been diagnosed with hypertension, insomnia, and anxiety. (Compl. ¶ 41.)

In Counts I and V of his complaint, Ross alleges that Defendants engaged in racial discrimination and subjected him to a hostile work environment in violation of Title VII and the IHRA. In Counts II and VI, Ross alleges the Defendants retaliated against him for filing internal complaints and memoranda about the discrimination in violation of Title VII and the IHRA. In Counts III and VII, Ross alleges that Defendants engaged in age discrimination in violation of the ADEA and the IHRA. In Count IV, Ross brings a claim of intentional infliction of emotional distress against Kara claiming a violation of Illinois common law. In Count VIII, Ross brings a claim of negligent retention against UChicago Argonne for retaining Kara as its employee in violation of Illinois common law. Finally, in Count IX, Ross brings a claim against UChicago Argonne under the theory of respondeat superior based on Kara's and Hyland's actions.

## II. LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(B)(6); *Gibson v. City of Chicago*, 910 F.3d 1510, 1520 (7th Cir. 1990). In ruling on a Rule 12(b)(6) motion, a court must accept as true all well-pleaded facts in the plaintiff's complaint and draw all reasonable inferences from those facts in the plaintiff's favor. *Anchor Bank, FSB v. Hofer*, 549 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss, the complaint must provide the defendant with fair notice of the basis of the claims set forth in the complaint, and those claims must be facially plausible. *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility, however, "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 662. Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" are insufficient. *Id.* A plaintiff must allege "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III. ANALYSIS

### I.     Defendant University of Chicago's Motion to Dismiss

On August 17, 2018, University of Chicago filed a motion to dismiss for failure to state a claim upon which relief can be granted. [ECF No. 12]. The briefing schedule set on that motion required Ross to file a response by September 19, 2018. [ECF No. 20]. Ross did not respond to University of Chicago's motion to dismiss. Ross's failure to respond to the motion to dismiss is a sufficient reason for a court to grant the motion. *See Brown v. Compass Group*, 2012 WL 1231064, at *1 (N.D. Ill. 2012) ("A plaintiff's failure to respond to a defendant's motion to dismiss therefore provides grounds for granting the motion."), quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 719 (7th Cir. 2011) (holding that "as to defendants' motion to dismiss the complaint, [Plaintiff] waived his right to contest the dismissal by failing to oppose the motions.")

While Ross's failure to respond to University of Chicago's motion to dismiss is a sufficient reason to grant that motion, the motion also is granted because University of Chicago is correct that Ross's complaint fails to state a claim against it. As a prerequisite to filing an employment

discrimination suit in federal court, a plaintiff must first present his claim to the EEOC.[2] *See*

*Johnson v. A & R Sec. Servs., Inc.*, 2012 WL 3023408, at \*2 (N.D. Ill. 2012) ("it is a basic principle

of employment discrimination law that a plaintiff may not sue a defendant in federal court unless

she has first presented her claim to the EEOC.") In general, a plaintiff may only bring a claim

against a defendant named in his EEOC charge. *See* 42 U.S.C. § 2000e-5(f)(1) ("A civil action

may be brought against the respondent named in the charge.")

Ross's claim against University of Chicago fails at Exhibit A to his complaint. Ross's filing

with the Illinois Department of Human Rights ("IDHR") and the EEOC names "Argonne National

Laboratory" as Ross's employer. Compl. [ECF No. 1] at Ex. A. (hereinafter "Ex. A"). It does not

name University of Chicago. As Ross did not name University of Chicago in his EEOC charge nor

allege it was his employer, University of Chicago is not a proper defendant to Ross's claims. This

dooms Ross's Title VII claim. Title VII only allows a party to bring a civil action against the

respondent named in the charge. *See* 42 U.S.C. § 2000e-5(f)(1)). Ross's IHRA charge clearly

names Argonne National Laboratory, a governmental entity that operates a lab in conjunction with

UChicago Argonne, LLC, as his employer. As such, University of Chicago was not given proper

notice of Ross's filing.

Ross alleges in a conclusory way that University of Chicago "operates Argonne National

Laboratory through its affiliate UChicago Argonne, LLC, and under contract with the U.S.

Department of Energy." (Compl. ¶ 9.) But Ross's complaint contains no factual allegation that

---

[2] The Court notes that Illinois courts apply the federal Title VII and ADEA framework to IHRA claims and therefore addresses these claims together. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *Zaderaka v. Ill. Human Rights Comm'n*, 131 Ill. 2d 172, 178 (Ill. 1989). In addition, when Ross filed with the Illinois Department of Human Rights, the IDHR automatically cross-files with the EEOC. *See* Illinois Department of Human Rights, Complaint Process, https://www2.illinois.gov/dhr/FilingaCharge/pages/federal_agencies_and_courts.aspx (last visited Oct. 18, 2018). Therefore, the Court will address the EEOC charge as it is identical to the IHRA charge.

University of Chicago, as an employer or otherwise, took any action against him. Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person[.]" *Williams v. Banning*, 72 F.3d 552, 553 n. 1 (7th Cir. 1995).[3] While Title VII's definition of employer is broad, Ross still must allege facts to show that he was employed by University of Chicago. *See Marijan v. Univ. of Chi.*, 2018 WL 3463272, at *7 (N.D. Ill. 2018) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1087-89 (7th Cir. 2008) (dismissing a claim against defendant where the complaint contained no allegations that the defendant had control over any relevant aspects of the plaintiff's employment); *Gunty v. Exelon Corp.*, 2014 WL 5622987, at *2 (N.D. Ill. 2014) (finding that "[w]hen a person works for a subsidiary corporation, any affiliates or parent corporations generally cannot be held liable for employment discrimination.") As Ross has not alleged that University of Chicago was his employer, had control over any relevant aspects of his work, or was anything more than an affiliate of UChicago Argonne, LLC, Ross's complaint against the University of Chicago must be dismissed.

## II. Defendants UChicago Argonne, LLC's and Fire Chief Hyland's Motion to Dismiss

### A. Counts I and V (Racial Discrimination and Hostile Work Environment)

#### (1) Hostile Work Environment

To state a hostile environment claim under Title VII or the IHRA, Plaintiff must allege that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance; and, (4) there is a basis for

---

[3] The Court need not discuss the ADEA's definition of employer as "Title VII, the ADA, and the Age Discrimination in Employment Act ("ADEA") use virtually the same definition or 'employer,' and that [c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably." *Williams v. Banning*, 72 F.3d 552, 554 n. 1 (7th Cir. 1995) (Citing *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1279-80 (7th Cir. 1995).

employer liability. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). To sustain a claim, a plaintiff must plead facts that his "workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21; *Volling*, 840 F.3d at 383 (applying Title VII harassment framework to IHRA claim). The test for pervasive or severe conduct involves consideration of multiple factors including "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Not all workplace conduct that a person finds reprehensible is recognized legally as constituting a hostile work environment. *Ford v. Minteq Shapes & Servs.*, 587 F.3d 845, 857 (7th Cir. 2009) (holding claim lacked severity and pervasiveness when coworker called plaintiff a "black African-American" until he was reprimanded and once called him a "gorilla.")

Ross alleges that in 2013 Kara "began treating Ross inappropriately by making racial comments and even [hanging] a black-faced puppet in Ross's locker." (Comp. ¶ 25.) Kara was subsequently disciplined for his behavior and then Fire Chief Patterson kept Kara from working on Ross's shift. Patterson said that if Kara wished to swap shifts, he was required to receive authorization from the fire chief. (Compl. ¶¶ 26, 27, 28.) In 2017, after Patterson retired, UChicago Argonne allowed Kara to transfer onto Ross's shift and, when he did so, Kara said to Ross "let the games begin." (Compl. ¶ 31.)

At the motion to dismiss stage, the Court must draw all legitimate inferences in Ross's favor. As such, the Court can infer that Kara's 2017 "let the games begin" comment is a reference to the 2013 incident. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (holding

that in evaluating a complaint's sufficiency, "we construe it in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the party's] favor.") Even after drawing all inferences in Ross's favor, however, there are no facts alleged upon which the Court can infer that Hyland or UChicago Argonne knew about Kara's 2017 "let the games begin" comment to Ross. In addition, Ross does not allege that he physically worked with Kara on the same shift more than once in 2017. Further, Kara's singular "let the games begin" comment does not meet the pleading standard for "severity" under Title VII.

While the federal notice pleading standard is liberal and merely requires that "[a] plaintiff's complaint . . . provide a short and plain statement of the claim showing that the pleader is entitled to relief," Ross still fails to allege a basis for employer liability as required under Title VII even under that lenient standard. *Swervo Entertainment Group, LLC v. Mensch*, 2017 WL 1355880, at *2 (N.D. Ill. 2017) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)); Compl. ¶ 31. Ross alleges that "Argonne knew of the harassment and failed to take prompt, effective remedial action calculated to end the harassment" (Compl. ¶ 44), but it is unclear whether Ross is alleging UChicago Argonne knew about both the 2013 and the 2017 incident. There are no facts alleged to indicate UChicago Argonne knew about the 2017 incident. While it did know about the 2013 incident, Ross acknowledges after that incident "Kara was suspended for five (5) shifts for engaging in the discriminatory and harassing actions and given a two (2) year probation." (Compl. ¶ 26.) UChicago Argonne acted appropriately in disciplining Kara for his actions. These facts do not square with Ross's allegation that UChicago Argonne failed to take steps to end the harassment. *Vance v. Ball State Univ.*, 646 F.3d 461, 471 (7th Cir. 2011) ("Once aware of workplace harassment, the employer can avoid liability for its employees' harassment if it takes

prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring.")

To the extent that Ross is relying on Kara's February 2017 "let the games begin" comment to support his hostile work environment claim, his complaint also falls short of alleging a basis for employer liability. Ross not only fails to allege that Hyland or UChicago Argonne were aware that Kara made this comment to Ross, but his complaint reads as though Hyland was only aware of the 2013 incident. In March 2017, for example, just a month after Kara's "let the games begin" comment, Ross alleges Hyland offered to keep Kara off Ross's shift "in light of the seriousness of the previous incident in 2013." (Compl. ¶ 33.) Ross does not allege Hyland mentioned the February 2017 comment at this time, a month after that comment allegedly was made. Read liberally, Ross's complaint alleges only that Hyland knew about Kara's continuing attempts to trade onto Ross's shifts.

Ross also alleges that he has worked only one shift with Kara since Kara was disciplined in 2013. (Compl. ¶ 31.) Ross has avoided working with Kara by denying Kara's shift trade requests and using his sick time to avoid working with Kara. (Compl. ¶¶ 37, 38.) While Ross may be trying to avoid potential harassment by Kara, his actions also prevent his hostile work environment claim from rising above the speculative level. If Ross only has worked one shift with Kara since 2013, as the current complaint reads, and only relatively minor incidents occurred during that shift and thereafter, Ross has not alleged the basis for a hostile work environment claim. *See Harris*, 510 U.S. at 21. Without more in the way of factual allegations, Ross alleges at best only speculative harm from potential future harassment if he and Kara work the same shifts.

Finally, and perhaps most crucially, Ross has not alleged conduct that meets the severity requirement established in *Harris*. At the motion to dismiss stage, courts in this district have set a

certain discretionary threshold for demonstrating severity. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (recognizing that "[w]e have stated that . . . there is no 'magic number of slurs' that indicates a hostile work environment. . .") While severity is, at its core, a discretionary call, Ross's complaint falls short of alleging the severe conduct that has been found to be a necessary predicate for a hostile work environment claim. For example, the Seventh Circuit has terminated at least two cases at the summary judgment stage finding that "one utterance of the n-word has not generally been held to be severe enough to rise to the level of establishing liability." *Nichols*, 755 F.3d at 601 (7th Cir. 2014) (citing *Smith v. N.E. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004)); *see also Lucas v. Chicago Transit Authority*, 367 F.3d 714, 716-25 (7th Cir. 2004) (upholding a grant of summary judgment against plaintiff for hostile work environment claim where supervisor said "if you don't like it here, [n-word], go home," and "[Plaintiff] is a dumb [n-word].") In the sexual discrimination context, a court in this district found that plaintiff's complaint of eight gender-related comments during her employment, including one comment that "the only valuable thing to a woman is that she has breasts and a vagina," was insufficient to demonstrate [a] hostile work environment." *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002).

When courts in this district have allowed hostile environment claims to move forward past a motion to dismiss, the conduct alleged has been more egregious and persistent than Ross has alleged here. In *Brownlee v. Catholic Charities of the Archdiocese of Chicago*, for example, three female plaintiffs were exposed to harassment on a "*daily* basis," were physically assaulted, and repeatedly asked about their sex lives by a male co-worker. *Brownlee v. Catholic Charities of the Archdiocese of Chicago*, 2017 WL 770997, at *2 (N.D. Ill. 2017) (emphasis added.) In another case, a plaintiff alleged that he was called "derogatory term[s] for people of Hispanic origin and/or

ethnicity," that his fellow firefighters "sabotaged" his safety gear by smearing dirt on the visor attached to his helmet, placing a nail in his boot with the sharp end toward his foot, and at one point threatening him with a knife. *Gomez v. City of Chicago*, 2017 WL 131565, at *1-2 (N.D. Ill. 2017). *See also Huri v. Office of the Chief Judge of the Circuit of Cook County*, 804 F.3d 826, 834 (7th Cir. 2015) (reversing district court's dismissal of plaintiff's hostile work environment claim because "screaming, prayer circles, social shunning, [and] implicit criticism" – "could plausibly be abusive.")

Ross has not alleged facts that take his complaint above the relatively high threshold for severity established in this circuit even at the pleading stage. While the Court does not condone Kara's alleged behavior, the 2013 incident and the 2017 comment are not enough, individually or in combination, to allege the kind of severe conduct that is sufficient to survive a motion to dismiss. The Maltese Cross accusation also does not advance Ross's cause in this respect. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment," for a hostile work environment claim). The post-2013 facts that Ross alleges as to Kara are Kara's continuing attempts to trade onto Ross's shifts, Kara's 2017 "let the games begin" comment, and Kara's accusation, also in 2017, that Ross did not order him a Maltese Cross for his uniform. (Compl. ¶¶ 32, 36.) These isolated incidents are not sufficient to state a Title VII hostile environment claim against UChicago Argonne even if Hyland was aware of them. In sum, Ross has not sufficiently pled his claim of a hostile work environment because the conduct he alleges occurred does not meet the severity threshold for such a claim and he has failed to plead a basis for employer liability.

### (2) Race Discrimination

In Count I of his complaint, Ross purports to state claims for both a hostile work environment and "race discrimination." It is unclear if these are intended to be two claims or one. To the extent Ross is attempting to allege a race discrimination claim separate from his hostile environment claim, he can utilize either the direct or indirect method of proof. In either case, though, he needs to allege he suffered an adverse employment action. *Mitchell v. City of Chicago*, No. 09-cv-3315 2013 WL 870576*5 (N.D. Ill. Mar. 7, 2013) (Dow, J.). Perhaps in an attempt to meet that pleading requirement, Ross alleges that he has forfeited 120 hours of sick time because he feels threatened when working with Kara, so he uses his sick time to avoid working on shifts with Kara. (Compl. ¶ 38.) Ross states that he "uses his sick time to avoid that interaction since Argonne is forcing him to work with his harasser." (Compl. ¶ 38.)[4]

There are two reasons why Ross's voluntary use of sick time to avoid contact with Kara does not rise to the level of an adverse employment action. First, the loss of *some* benefits generally does not rise to the level of an adverse employment action. *See Tolliver v. PPG Indus., Inc.*, 2012 WL 1982702, at *3 (C.D. Ill. 2012) (granting a motion to dismiss on the grounds that plaintiff did not show a material loss of benefits that would rise to the level of adverse employment action where she was denied vacation days, requests to change days off work, shift hours, and comp. time.) Ross does not allege how his use of sick time translates into a significant alteration of his benefits or a material loss to him. Second, the voluntary nature of Ross's use of his sick time defeats his claim of an adverse employment action. *See Graehling v. Vill. of Lombard*, 1994 WL 698525, at *8 (N.D. Ill. 1994) ("merely because a plaintiff is faced with an inherently unpleasant

---

[4] A hostile work environment is itself an adverse employment action. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454 (7th Cir. 2011) (citing *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 722-45 (7th Cir. 2002). For the reasons discussed above, though, Ross has not adequately alleged such a claim.

situation in that [his] choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness . . ."). Even the *involuntarily* placement of an individual on paid administrative leave has been found not to constitute an adverse employment action. *See Markose v. Ill. Dep't of Human Servs.*, 2005 WL 233813, at \*9 (N.D. Ill. 2005) (finding paid administrative leave for one week without identifying any financial or other career-related detriment caused by the brief paid leave does not rise to the level of a materially adverse employment action.)

A plaintiff in either a Title VII or an ADEA case must plead he was the victim of a decision by his employer that caused a significant change in his employment status or in his benefits. While Ross's voluntary use of sick time may diminish the amount of sick time he has accrued, it does not rise to the level of egregiousness necessary to constitute an adverse employment action at least based on his current complaint. In addition, Ross apparently was able to use his sick days without any adverse action or comment from his superiors until December 13, 2017, when Hyland allegedly warned Ross that he could not continue to use his sick days without a legitimate operational reason, and not working on Kara's shift was not such a reason. Ross does not allege that his benefits or any other aspect of his employment was significantly altered in any way by his employer and, if anything, his complaint implies the contrary.

Ross was confronted with two inherently unpleasant situations in his view – work with Kara or use his accrued sick time to avoid doing so. As *Graehling* holds, however, the choice between two unpleasant alternatives does not obviate the voluntariness of an individual's choice. Ross's complaint itself reveals the voluntary nature of Ross's use of sick time as it states, "he uses his sick time to avoid that interaction [with Kara]." (Compl. ¶ 38). While the Court recognizes that the choice between working with an alleged harasser and using one's sick time may be inherently unpleasant, Ross cannot have it both ways. He cannot claim that his employer took an adverse

employment action against him while at the same alleging that he voluntarily chose to use his own sick time. A Title VII plaintiff must allege his *employer* took an adverse action against him. *Lewis*, 496 F.3d 645 at 652 (an adverse employment action is generally defined as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits.") For these reasons, Ross has not sufficiently pled an adverse employment action based on a loss of sick time that satisfies Title VII, the ADEA, or the IHRA for purposes of a straight race discrimination claim.

### B.    Counts II and VI (Retaliation)

To plead a retaliation claim under Title VII, a plaintiff must allege he engaged in a protected activity, he suffered an adverse employment action, and a causal link between the two. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). In the context of an IHRA retaliation complaint, Illinois courts employ the same analytical framework as Title VII. *Frey v. Hotel Coleman*, 141 F.Supp.3d 873, 883 (N.D. Ill. 2015).

Crucial to Ross's claim in this case is need for a causal link between his engaging in a protected activity and an adverse action being taken against him. At the pleading stage, courts have recognized that "a retaliation claim can indeed be so bare-bones that a lengthy time period between the protected activity and the alleged retaliation will make any causal connection between the two implausible." *Brownlee*, 2017 WL 770997, at *7 (holding that there was no causal link when there were thirty months between harassment complaint and termination); *Lugo v. Int'l Bhd. of Elec. Workers Local # 134*, 175 F.Supp.3d 1026, 1038 (N.D. Ill. 2016) (granting motion to dismiss retaliation claim where one-year gap existed between the plaintiff's protected activity and the alleged retaliation, and the plaintiff did not explain the long delay between the two); *Carmody v.*

*Bd. of Trustees of Univ. of Ill.*, 747 F.3d 470, 480 (7th Cir. 2014) (affirming dismissal of retaliation claim where three years separated protected activity and the alleged retaliation.).

As an initial matter, the temporal proximity between Ross's alleged protected action, *i.e.*, filing an EEOC complaint in 2013 (and even his filing of unspecified "internal complaints, memorandums [sic] and incident reports" on unspecified dates thereafter), and any causally related adverse employment action is at best unclear based on the current pleading. (Compl. ¶ 52.) While Ross's filing with the EEOC and his filing internal complaints with UChicago Argonne may constitute protected activity under Title VII and the IHRA, it is not clear from Ross's complaint when the post-2013 events occurred and what employer actions he is alleging were taken in retaliation for that conduct. The absence of this causal link is fatal to his retaliation claim at the pleading stage.

In addition, the only arguably discernible employment actions that Ross does allege – that he lost managerial responsibilities and authority, that Hyland said Ross would be given corrective action if he continued to deny Kara's shift change requests, and Hyland's advice that Ross's desire to avoid working with Kara is not a sufficient operational reason to deny a shift trade requests – do not constitute adverse employment actions even if they were causally related to Ross's complaints which, again, is not clear from his pleading. (Compl. ¶¶ 37, 39, 40.) While Ross does not specify in his complaint what managerial responsibilities and authority he lost, the Court presumes he is referring to Hyland taking away his responsibility for personnel lockers and firefighter's clothing and gear. (Compl. ¶ 40.) An adverse employment action is a significant change in an employee's responsibilities. As Ross himself says in his response to Defendants' motion to dismiss, "a [m]aterially adverse employment action is something 'more disruptive than a mere inconvenience or an *alteration of job responsibilities*." *Nichols v. Southern Ill. Univ.*

*Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (emphasis added) (Pl.'s Response Br. [ECF No. 26] at 3). Courts have held that even a transfer to another department that does not involve a change in hours, pay, major job responsibilities, or restrictions in an employee's ability to advance within the company does not constitute an adverse employment action. *Lowe's Home Ctrs.*, 2009 WL 3824610, at *4 (N.D. Ill. 2009). Ross has not alleged that he suffered an adverse employment action when viewed in the light of established case law.

Ross alleges that he is the only battalion chief to have the referenced responsibilities taken away from him. (Compl. ¶ 40.) However, the fact that Ross is the only battalion chief to have certain, relatively minor responsibilities taken away from him does not transform Hyland's actions into anything more than the kind of mere alteration of some job responsibilities that has been held not to be an adverse employment action. Ross does not allege he experienced a change in major job responsibilities or even in pay and hours. In fact, as Ross's complaint reveals, he is still employed as a battalion chief with UChicago Argonne and, aside from the minor job alterations he has experienced, he apparently continues to perform the same responsibilities as other battalion chiefs. He was not transferred as was the plaintiff in *Lowes* or even threatened with a transfer, demotion, or termination. Moreover, that Hyland took away Ross's responsibility for personnel lockers, firefighter clothing, and gear in April 2018, seven months after Ross filed his claims with the EEOC, is too remote to be an actionable adverse employment action if that filing is alleged to be the predicate event for this alleged retaliation.

Ross's allegation that he experienced an adverse employment action because of Hyland's warning that he would be given corrective action if he continued to use his sick time to avoid working with Kara fares no better. (Compl. ¶ 39.) Ross does not allege he received any corrective action. Instead, Hyland merely "threatened" to take that action in the future if Ross continued to

use sick time to avoid working with Kara. *Id.* Threats of corrective action or even relatively mild corrective action assessed do not rise to the level of an adverse employment action. *Ribando v. United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999) (granting a motion to dismiss on the grounds that a letter of concern or counseling, standing alone, does not rise to the level of an adverse employment action. . ."); *Watson v. Potter*, 2009 WL 424467, at \*6 (N.D. Ill. 2009) ("The letters of warning were just that: warnings that avoided actual adverse action."); *Lucas*, 367 F.3d at 731 (7th Cir. 2004) ("admonishment by an employer does not rise to the level of an adverse employment action unless there is some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit.").

Similar to the plaintiff in *Lucas*, Ross received an admonishment, if that, with no tangible job consequences. In fact, unlike the plaintiffs in *Ribando* and *Watson*, Ross never received even a formal letter of concern or formal warning. There is nothing in Ross's complaint to indicate that this reprimand (or threat as Ross puts it) by Hyland resulted in any change of employment status, benefits, or even formal action being taken against him.

In sum, Ross has not sufficiently pled his claim for retaliation because he has not alleged he suffered an adverse employment action and there is a lack of temporal proximity between his alleged protected activity and any alleged adverse employment actions that he purports to allege occurred.

### C.    Counts III (Age Discrimination)

As to Ross's purported ADEA claim, the Court also notes that under the ADEA, a plaintiff must plead that there is some causal connection between his age and the adverse employment action taken against them. *Mack v. City of Chi.*, 2017 WL 951369, at \*6 (N.D. Ill. 2017) (holding

that to survive a motion to dismiss, a plaintiff asserting an ADEA claim need only allege she "is over 40 and thus protected by the ADEA and that she was *treated less favorably* than similarly-situated workers of a different age."); *Levin v. Madigan*, 697 F. Supp. 958, 966 (N.D. Ill. 2010) (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) (holding that to state a claim for age discrimination under the ADEA, a plaintiff need only allege she suffered a *specified* adverse employment action on the *basis* of her age) (emphasis added).

Ross fails to allege that there was any causal connection between his age and anything that could be considered an adverse employment action. In fact, Ross merely states that "Argonne knowingly and willfully discriminated against Ross on the basis of his age in violation of the ADEA." (Compl. ¶ 57.) As the Supreme Court in *Iqbal* stated, "labels and conclusions" or a "formulaic recitation of the elements of a cause of action are insufficient." *Iqbal*, 556 U.S. at 662. Ross offers just that, a mere formulaic recitation of the elements of an ADEA violation, without drawing a causal connection between Ross's age and an adverse employment action.

### D. Counts IV and VIII (State Law Tort Claims)

Ross also alleges two state law claims, intentional infliction of emotional distress ("IIED") and negligent retention. The Illinois Supreme Court has held that "the legislature intended the [IHRA], with its comprehensive scheme of remedies and administrative procedures, to be the exclusive source of redress for alleged human rights violations." *Mein v. Masonite Corp.*, 109 Ill.2d 1, 92 (Ill. 1985). Where a claim is "inextricably linked" to an alleged violation of an employee's civil rights, it is preempted by the IHRA. *See Geise v. Phoenix Co. of Chi., Inc.*, 159 Ill.2d 507, 203 (Ill. 1994); *see also EEOC v. Foster Wheeler Constructors, Inc.*, 1998 WL 850810, at *3 (N.D. Ill. 1998) (holding claim of IIED based on racial discrimination was preempted by the IHRA, and stating that "courts in this district have routinely dismissed Illinois state tort claims

particularly intentional infliction of emotion distress claims for lack of jurisdiction brought in connection with allegations of a civil rights violation.") A claim is inextricably linked to a civil rights violation under the IHRA where "eliminating the civil rights component . . . takes the air out of the case." *Sanlap v. LaSalle Bank, FSB,* 345 F.3d 515, 519 (7th Cir. 2003).

### (1) Intentional Infliction of Emotional Distress

Ross brings a claim under Illinois state law for IIED alleging that Kara's "harassing and threatening actions towards Ross were extreme and outrageous." (Compl. ¶ 60.) Under Illinois law, to state a claim for IIED, a plaintiff must show "first, the conduct must be truly extreme and outrageous; second, the actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress; and third, the conduct must in fact cause severe emotional distress." *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041, at *63 (Ill. 2016).

In this case, Ross's primary allegations are that Kara caused him emotional distress based on the 2013 incident, unspecified continuing acts of harassment, and Kara's "let the games begin" comment in 2017. Further, Ross incorporates all his allegations of discrimination into his IIED count (Compl. ¶ 59) and makes it evident that his IIED claim sounds in race discrimination. It is clear that Ross's IIED claim stems from his allegations of racial harassment or discrimination. Ross does not allege that Kara engaged in behavior other than the alleged discrimination that could form the basis of an IIED claim. Additionally, the facts do not show that Kara's behavior violated any other legal duties than those established by the IHRA. If the Court were to excise Ross's discrimination allegations from his IIED claim, then, as the Seventh Circuit described in *Sanlap*, the air comes out of the IIED claim and nothing is left at all. *Mosley v. McDonald's Corp.*, 2006

WL 3541872, at *3 (N.D. Ill. 2006) (citing *Sanlap*, 345 F.3d at 519). Therefore, the IHRA preempts Ross's IIED claim because it is inextricably linked to his discrimination allegations.

### (2) Negligent Retention

Ross brings a claim under Illinois state law alleging that Kara had a particular unfitness for the position of firefighter and UChicago Argonne knew or should have known that was the case when it continued to employ Kara after the 2013 incident. (Compl. ¶ 81.) Under Illinois law, to state a claim for negligent retention, the Plaintiff must plead that "(1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Van Horne v. Muller*, 185 Ill. 2d. 299, 311 (Ill. 1998).

Similar to Ross's IIED claim, his negligent retention claim is based on the 2013 incident and Kara's behavior that followed. Ross also incorporates all his allegations of discrimination into his negligent retention claim. (Compl. ¶ 79.) In this instance, it is UChicago Argonne's alleged breach of duty to prevent unlawful discrimination in the workplace that Ross relies on to support his negligent retention claim. Ross alleges that it was Kara's acts of racial animus and harassment that should have put UChicago Argonne on notice that Kara was particularly unfit for his job as a firefighter. As stated above, though, once Ross's allegations of civil rights violations are excised from his complaint, there appears to be nothing left to support a claim of negligent retention. Therefore, the IHRA also preempts Ross's negligent retention claim as it is inextricably linked to his discrimination allegations.

### E.  Respondeat Superior (Count IX)

As discussed in Section II.D, Ross's two personal injury claims are preempted by the IHRA. Without a surviving tort claim against either Defendant, Ross's respondeat superior claim against UChicago Argonne must be dismissed. As the Illinois Supreme Court has explained, "vicarious liability is not itself a claim or cause of action." *Wilson v. Edward Hosp.*, 2012 IL 112898, ¶ 24 (Ill. 2012); accord *Simon v. Nw. Univ.*, 183 F. Supp. 3d 908, 919 (N.D. Ill. 2016) (respondeat superior is not an independent cause of action and must be predicated on underlying tortious act.) As both Ross's IIED and negligent retention claims have been dismissed as preempted, Ross's claim of respondeat superior fails against UChicago Argonne because there is no underlying tortious act to support that claim. *Bachenski v. Malnati*, 11 F.3d 1371, 1377–78 (7th Cir. 1993) ("[W]hen respondeat superior is the sole asserted basis of liability against a master for the tort of his servant an adjudication on the merits in favor of either the master or servant precludes suit against the other[.]")

### F.  Claims Against Hyland Alone

Ross also purports to bring suit against Hyland in his individual and official capacity but he does not specify what claims he is alleging against Hyland in either capacity. Under Federal Rule of Civil Procedure 8, a complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007). Ross's complaint fails to put Hyland on fair notice of the claims against him because it does not indicate what claims are being brought against him in his individual or official capacity. Ross also does not explain what distinction he purports to draw between Hyland's individual and official capacity in this private race discrimination case. Ross's complaint thus fails to meet the requirements of Federal Rule of Civil Procedure 8.

In addition, Ross cannot assert a claim against Hyland in his individual capacity because a supervisor cannot be held individually liable for claims asserted under Title VII, the ADEA, or the IHRA. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998) ("a supervisor does not, in his individual capacity, fall within Title VII's definition of an employer"); *Horwitz v. Bd. of Educ.*, 260 F.3d 602, 610 n.2 (7th Cir. 2001) (no individual liability under the ADEA); *Washington v. Univ. of Ill. at Chi.*, 2010 WL 1417000, at *3 (N.D. Ill. 2010) (dismissing with prejudice claims alleged against university officials under Title VII, the ADEA and the IHRA because there is no individual liability.") For all these reasons, Ross has not alleged a claim against Hyland in any capacity that can withstand Hyland's motion to dismiss.

## IV. CONCLUSION

For all the reasons set forth in this Memorandum Opinion and Order, Defendant University of Chicago's Motion to Dismiss [ECF No. 12] is granted without prejudice and Defendants UChicago Argonne's and Hyland's Motion to Dismiss [ECF No. 16] is granted without prejudice. If he wishes to do so, Plaintiff is given leave to file an amended complaint within the next 45 days, or by January 25, 2019, but only if he can do so consistent with this Memorandum Opinion and Order.

It is so ordered.

_____
Magistrate Judge Jeffrey T. Gilbert

Dated: December 10, 2018