# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JIMMY ROSS )<br><br>Plaintiff, )<br><br>v. )<br><br>UCHICAGO ARGONNE, LLC, Fire )<br>Chief GEORGE HYLAND, Individually )<br>and in his Official Capacity, and Fireman )<br>RICHARD KARA, Individually and in )<br>his Official Capacity, )<br><br>Defendants. ) | No. 18 CV 04200<br><br>Magistrate Judge Jeffrey T. Gilbert |

## MEMORANDUM OPINION AND ORDER

On December 10, 2018, the Court issued a Memorandum Opinion and Order [ECF No. 30] granting Defendants' Motions to Dismiss [ECF No. 12, 16] without prejudice. The Court, however, gave Plaintiff Jimmy Ross ("Plaintiff" or "Ross") leave to file an amended complaint if he wanted to do so. [ECF No. 30]. Ross timely filed his amended complaint on January 25, 2019. [ECF No. 31]. This case is now before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). [ECF No. 37]. For the reasons discussed below, Defendants' Motion to Dismiss is granted with prejudice as to all counts.

## INTRODUCTION

Plaintiff's First Amended Complaint contains the same nine counts as his Initial Complaint. In Counts I and V, Ross alleges that Defendants engaged in racial discrimination and subjected him to a hostile work environment in violation of Title VII and the Illinois Human Rights Act ("IHRA"). In Counts II and VI, Ross alleges the Defendants retaliated against him for filing

1

internal complaints and memoranda about the discrimination in violation of Title VII and the IHRA. In Counts III and VII, Ross alleges that Defendants engaged in age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") and the IHRA. In Count IV, Ross brings a claim of intentional infliction of emotional distress against Defendant Richard Kara ("Kara") claiming a violation of Illinois common law. In Count VIII, Ross brings a claim of negligent retention against Defendant UChicago Argonne, LLC ("Argonne") for retaining Kara as its employee in violation of Illinois common law. Finally, in Count IX, Ross brings a claim against Argonne under the theory of respondeat superior.

The below facts reflect the standard of review under Federal Rule of Civil Procedure 12(b)(6), which requires the Court to construe the complaint in the light most favorable to Plaintiff. The Court gives Plaintiff the benefit of accepting all well-pleaded facts as true, as well as all reasonable inferences that can be drawn in Plaintiff's favor from those alleged facts.

Plaintiff Ross is an African-American male born in 1954. He has been a firefighter in the Argonne Fire Department since 1997. In 2010, he was promoted to fill the position of one of three Battalion Chiefs. Out of 26 employees, Ross is the only African-American employee at the Argonne Fire Department.

Ross began to experience issues with another firefighter, Defendant Kara, about three years after being promoted to Battalion Chief. In 2013, Kara made racial comments towards Ross and hung a black-faced puppet in Ross' locker. Ross reported the incident to the Argonne human resources department, resulting in Kara being suspended for five shifts and placed on probation for two years. The chief of the Argonne Fire Department at the time of the incident, Chief Patterson, subsequently assured Ross that Kara would no longer work on the same shift as him. Ross considered the matter handled at the time.

On April 1, 2016, Chief Patterson retired and was replaced by Defendant George Hyland ("Chief Hyland"). About a year later, on February 10, 2017, Kara traded onto Ross' shift for the first time since the 2013 incident. While on Ross' shift, Kara said to Ross, "let the games begin," which Ross believed was a reference to the incident that occurred in 2013. Ross informed Chief Hyland of this comment. On March 14, 2017, Chief Hyland communicated to Ross that he supported Ross' decision to deny Kara's trade onto his shift. In an email directed to both Ross and Kara, Chief Hyland stated he had looked at the paperwork from the incident in 2013 and supported Ross' decision to deny the recent trade given the seriousness of the 2013 incident. However, Ross believes that Chief Hyland simultaneously encouraged Kara to submit a grievance about Ross denying Kara's shift change request and to continue to trade onto Ross' shifts.

Around the same time as Kara's comment to "let the games begin" in March of 2017, Ross placed an order for Maltese Crosses for all the firefighters' uniforms. Kara accused Ross of failing to order a Maltese Cross for him, though Ross indicated that none of the firefighters had received the crosses. On or about March 29, 2017, Ross emailed Chief Hyland and expressed concern about Kara's conduct. Ross stated that "Kara has and will make my work a hostile work environment" and told Chief Hyland that he "would like to see this behavior stopped." Ross emphasized that Chief Patterson had previously promised Ross that Kara would not work a trade onto his shift and asked that Chief Hyland maintain that state of affairs.

However, Chief Hyland did not accommodate Ross' requests not to work with Kara. Instead, Ross was made to interact with Kara with increasing frequency over the next several months. On or about May 2, 2017, Ross was working an overnight shift when Kara decided to sleep at the station after holding overtime for another firefighter. Ross felt threatened and uneasy

by Kara's presence, and did not sleep as a result. On June 3rd, June 29th, and August 10th, Kara again worked on Ross' shift, several of which were overnight and resulted in Ross losing sleep.

On August 10, 2017, Chief Hyland told Ross he would be written up for insubordination and unsatisfactory job performance if Ross denied any more of Kara's trade requests. On August 15, 2017, Ross nevertheless denied Kara's request to trade onto his shift. Chief Hyland then informed Ross that his "subjective desire to avoid working with Firefighter Kara is not a sufficient operational reason to deny a shift trade request" and cautioned him that "[i]n the future, you are not authorized to deny trade requests unless there is a legitimate operational reason for the denial. If you deny any further shift trade requests without sufficient operational justification in the future, I will consider it to be insubordination and unsatisfactory job performance." Kara subsequently worked overnight on Ross' shift on September 16th and September 18th, causing Ross to lose two more nights of sleep for fear of what Kara might do to him.

After Chief Hyland warned Ross to stop denying Kara's trades, Ross' and Chief Hyland's relationship began to deteriorate. For example, on November 8, 2017, Chief Hyland gave Ross a performance appraisal that included comments Ross found insulting, such as a recommendation that "as part of [Ross'] current pursuit of a degree, purchase and read one book on grammar to help keep your correspondence error-free." On December 8, 2017, Chief Hyland verbally reprimanded Ross for emailing, rather than calling, him about a particular issue, which Ross believed was unwarranted given the frequency with which other battalion chiefs send similar emails. On January 24, 2018, Chief Hyland also failed to notify Ross of a meeting with other battalion chiefs, resulting in Ross being excluded from the meeting. A few months later, on April 5, 2018, Chief Hyland sent an email to Ross suggesting he needed further training to address errors in his time entries, though no other battalion chiefs received similar criticism. Chief Hyland further removed Ross'

responsibility for personnel lockers, firefighter's clothing, and gear, even though other battalion chiefs were responsible for these tasks. On several occasions, Chief Hyland told Ross that he should just retire. Ross believed condescending comments from Chief Hyland eroded the respect other department members had for him and impacted his ability to supervise. Ross ultimately documented his concerns about his relationship with Chief Hyland in an email to Kim Madekich, an employee at Argonne, and indicated that he believed he was being treated differently than other battalion chiefs because of his race.

As a result of the events at Argonne, Ross lost about 120 hours of sick time, as well as numerous hours of sleep on the nights Kara worked his shifts. Ross has also been diagnosed with hypertension and insomnia, both of which require medication, as well as anxiety.

## ANALYSIS

Defendants' have renewed their Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and challenge the sufficiency, not the merits, of Plaintiff's amended complaint. FED. R. CIV. P. 12(B)(6); *Gibson v. City of Chicago*, 910 F.3d 1510, 1520 (7th Cir. 1990). The Court is governed by the same standard as in its previous opinion, in that the Court accepts as true all well-pleaded facts in Plaintiff's complaint and draws all reasonable inferences from those facts in Plaintiff's favor. *Anchor Bank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011); *Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614, 618 (7th Cir. 2007).

To survive a motion to dismiss, the complaint must contain a short and plain statement of the claim that provides the defendant with fair notice of what the claim is. FED.R.CIV.P. 8(a)(2); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The claim for relief must be plausible on its face, which occurs "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility, however, demands more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* Rather, the factual allegations in the complaint must be sufficient to raise the possibility of relief above a "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007), quoting *Twombly*, 550 U.S. at 555. Therefore, dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

### I. Counts I and V: Hostile Work Environment and Racial Discrimination

#### A. Hostile Work Environment

Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). In order to prevail on a Title VII claim for a racially hostile work environment, a plaintiff must show that "he is a member of a class protected by the statute," that "he has been subjected to a hostile work environment," and that he was subjected to this hostile work environment "on account of [his] membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018), quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013). In order for the environment to be actionably hostile, a plaintiff must demonstrate that "(1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability." *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 476 (7th Cir. 2004); *see also, Robinson v. Perales,* 894 F.3d 818, 828 (7th Cir. 2018).

In evaluating whether the harassment created an intimidating, hostile, or offensive working environment, the Court "must consider the severity of the alleged conduct, its frequency, whether

it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson,* 894 F.3d at 828. A workplace "need not be hellish to constitute a hostile work environment." *Jackson v. County of Racine,* 474 F. 3d 493, 500 (7th Cir. 2007); *see also, Gates v. Board of Education,* 916 F. 3d 631 (7th Cir. 2019). Rather, a single incident, if severe enough, may be sufficient to establish a hostile work environment. *See, e.g., Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). "Conversely, conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson*, 474 F.3d at 499.

The Court previously dismissed Ross' hostile work environment claim for three primary reasons. First, Ross failed to allege facts sufficient to show a basis for employer liability. Second, he did not allege facts to demonstrate harm that was not merely speculative, and third, he had not alleged conduct severe or pervasive enough to establish a claim for a hostile work environment.

### i. Employer Liability

With respect to the first issue of employer liability, Ross' amended complaint alleges, for the first time, that Chief Hyland was contemporaneously informed of Kara's 2017 comment to "let the games begin." The amended complaint further contains new information regarding conversations Ross had with both Chief Hyland and Kim Madekich, an employee at Argonne, about Kara's conduct during 2017 and 2018 and the effect it had on Ross' health. It similarly describes action taken by Chief Hyland that not only allowed Ross and Kara to work on the same shift on multiple occasions, but that Chief Hyland threatened Ross with insubordination and reprimand were he to continue to avoid working with Kara at Argonne. Ross' amended complaint alleges that Chief Hyland, as well as Argonne, knew of the perceived harassment by Kara in 2017

7

and 2018 and failed to address it. *See, e.g., Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (employers may be liable for the discriminatory acts of coworkers if they are negligent either in discovering or remedying the harassment).

Ross has supported this allegation with facts that suggest he engaged in several verbal and written conversations with Chief Hyland and Argonne in 2017 and 2018 and these conversations fell on deaf ears. [ECF No. 31, ¶¶ 31, 38, 39, 57]. Perhaps Chief Hyland, and by extension Argonne, did not feel Kara's conduct in 2017 and 2018 was severe enough to warrant corrective action. However, evaluating the character of the harassment is a separate inquiry from whether Chief Hyland and Argonne were aware of the alleged harassment and took any steps at all to remedy it, which the amended complaint claims they did not. Ross therefore has alleged a basis for employer liability sufficient to survive a motion to dismiss.

### ii.    Speculative Harm

New facts alleged in the amended complaint also have cured the speculative nature of the harm Ross suffered. Whereas Ross previously alleged only a single shift when he and Kara worked together after the 2013 and 2017 incidents, Ross has now described a pattern of working at least six shifts with Kara that resulted in loss of sleep and emotional distress for Ross. While Defendants characterize the impact on Ross' health as minor, the alleged harm is sufficiently specific to take it out of the realm of speculation.

### iii.    Severe or Pervasive Conduct

While Ross successfully addressed the above defects in his amended complaint, his biggest challenge in surviving a motion to dismiss continues to be establishing conduct severe or pervasive enough to constitute an actionable hostile work environment. The Court previously cautioned Ross of this hurdle in its previous opinion, yet the allegations in Ross' amended complaint in support of

his hostile work environment claim are nearly identical to the original. The amended complaint alleges, as did the first, that Kara was the primary perpetrator of alleged discriminatory conduct at the Argonne Fire Department. This is clear from both Ross' amended complaint and his response to the Motion to Dismiss currently before this Court. [ECF No. 44, p. 6-7] ("*Kara's* initial harassment and discriminatory acts occurred against Plaintiff in 2013...*Kara* continues to harass Plaintiff and goes out of his way to trade shifts to ensure he is on Plaintiff's shifts so he can intimidate and harass him...Ross put the Defendants on notice of *Kara's* behavior numerous times...") (emphasis added).

Ross' amended complaint contains additional facts regarding Chief Hyland's conduct; for example, that Chief Hyland excluded Ross from a meeting on January 24, 2018 and suggested Ross needed additional training to address inaccuracies in his time entries. However, Ross has not "attribute[d] a racial character or purpose" to those actions. *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011). Without this character, they cannot be properly considered discriminatory conduct that contributed to a hostile work environment. *Id.; see also, Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999). While Chief Hyland need not have used overtly racial terms, such as "racial slurs, epithets, or other overtly race-related behavior," Ross must still plead facts sufficient to show that Chief Hyland subjected Ross to those actions because of his race. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004); *see also, Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("[t]o support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose"). Even drawing all reasonable inferences in his favor at this stage, Ross simply has not done so. Without facts to establish that any of Chief Hyland's conduct was motivated by, or had anything to do with, race, Ross' complaint simply falls short in this respect.

Therefore, although the additional allegations involving Chief Hyland are relevant to the elements of employer liability and Ross' separate claim of retaliation, they do not advance Ross' argument with respect to the severity or pervasiveness of Kara's racially-based conduct, which is the dispositive question before the Court in evaluating Ross' claim. *See, e.g, Gates,* 916 F.3d 631.

The Court now turns to whether Kara's conduct was severe or pervasive enough to state a claim that Ross was subjected to a hostile work environment at the Argonne Fire Department over the course of five years, from 2013 to 2018. During that time, three incidents between Kara and Ross are key: (1) in 2013, Kara made racially-based comments towards Ross and hung a black-faced puppet in Ross' locker; (2) in 2017, Kara worked a shift with Ross for the first time since 2013 and said to Ross, "let the games begin," and (3) in 2017, Kara had a conversation with Ross in which Kara accused Ross of failing to order a cross for his uniform. Other than these incidents and Kara's presence during six of Ross' shifts in 2017, Ross does not allege any interaction with Kara during those five years, discriminatory or otherwise.

In determining whether Kara's conduct is sufficiently severe or pervasive to be actionable, the Court looks at the totality of the circumstances, as it did in its previous opinion considering a nearly identical pleading. *Lambert v. Peri Formworks Sys., Inc.,* 723 F.3d 863, 868 (7th Cir. 2013). While a single, severe incident may be enough to establish a hostile work environment, "generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident." *King v. Bd. of Regents of Univ. of Wisconsin Sys.*, 898 F.2d 533, 537 (7th Cir. 1990).

Considering the totality of the circumstances, including drawing all reasonable inferences in Ross' favor at this stage, the Court finds that Ross has not alleged pervasive or severe harassment. The Court has evaluated several factors, including the frequency of the conduct,

whether it was physically threatening, and whether it unreasonably interfered with Ross' work performance. *Robinson,* 894 F.3d at 828.

First, Kara's discriminatory conduct was infrequent, in that it involved only three isolated incidents over a long period of time. *See, e.g., Patt v. Family Health Systems, Inc.,* 280 F.3d 749, 754 (7th Cir. 2002) (eight offensive gender-based comments over the course of several years were too isolated and sporadic to constitute severe or pervasive harassment). Four years passed between Kara's first discriminatory act towards Ross and their next in-person interaction, which was Kara's comment to "let the games begin." During this four-year intervening period, Ross does not allege that he worked a single shift with, or even saw, Kara at the fire department. The two verbal comments from Kara in 2017, which were separated by a month, were similarly infrequent and do not advance Ross' case. *See, e.g., Scruggs v. Garst Seed Co.,* 587 F.3d 832, 840-41 (7th Cir. 2009) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment" for a hostile work environment claim).

Nor has Ross shown that Kara's discriminatory conduct impacted his work performance. Rather, his pleadings suggest the opposite. Ross alleges that Chief Hyland gave him a performance appraisal that did not reflect his continued standard of good work at the Argonne Fire Department. [ECF No. 31, ¶50] ("In Ross' twenty years at Argonne, he never received negative performance appraisals…[he] was noted as 'always respectful of every member of the department, as well as others outside…is always mindful of all Lab safety procedures and initiatives, and ensures the safety of his members at all times.'"). Ross still is employed as a Battalion Chief at Argonne. He has not been demoted, reprimanded,[1] transferred, or suffered any reduction in pay or benefits, as

---

[1] While Ross' pleadings indicate that Chief Hyland threatened to reprimand Ross on several occasions, there is no allegation that Ross, in fact, received any disciplinary action beyond a single verbal warning.

one might expect if Kara's conduct interfered with his work performance. *See, e.g., Rosario v. Aunt Martha's Youth Serv. Ctr.,* 2017 WL 4882365, at *4 (N.D. Ill. 2017); *Fudali v. Napolitano,* 2014 WL 1097840, at *18 (N.D. Ill. 2014); *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005). Ross himself stated in a 2018 email that he "just wanted to come to work to do his job, keep everyone safe and go back home to his family," suggesting to the Court that he enjoys his work at Argonne and intends to keep up his good performance. The Court cannot infer, even at this stage, that Ross' work performance has suffered where his complaint does not allege facts that support this conclusion.

Nor does Kara enjoy a supervisory position over Ross such that Kara's discriminatory conduct warrants increased scrutiny. *Gates,* 916 F.3d at 638 ("We have repeatedly treated a supervisor's use of racially toxic language in the workplace as much more serious than a co-worker's.") (citing *Robinson*, 894 F.3d at 828–29; *Rodgers v. Western-Southern Life Insurance Company*, 12 F.3d 668, 675 (7th Cir. 1993); *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 271 (7th Cir. 2004)). In fact, the opposite is true: Ross is Kara's supervisor, and until 2017, was able to use this position of authority to deny Kara's attempts to trade onto his shift. This inverse power imbalance between Ross and Kara detracts from Ross' claim of a severe or pervasive hostile work environment.

As noted in the Court's first opinion, the severity of alleged racially-based conduct is, at its core, a discretionary call. It is undisputed that Kara's conduct in 2013, in which he hung a black-faced puppet in Ross' locker, is the most racially-charged, offensive allegation Ross describes. However, Ross does not allege that Kara hung the puppet by a noose or in a directly threatening manner. Based on the facts Ross himself alleges, this single incident six years ago is not enough to establish a hostile work environment as a matter of law. *See, e.g., Nichols v. Mich. City. Plant*

*Planning Dep't,* 755 F.3d 594 (7th Cir. 2014); *Lucas v. Chicago Transit Authority,* 367 F.3d 714 (7th Cir. 2004). Nor do the more recent incidents in 2017 bolster Ross' claim such that the Court could conclude "the entire context of the workplace" was hostile. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). Not only were those two incidents comparatively minor, they lacked an overt discriminatory or racial purpose. Even though the Court has drawn the inference that both incidents refer back to Kara's racially-charged conduct in 2013, the overtly non-racial or at least ambiguous character of the two recent incidents themselves is still a factor for this Court to consider.

The Court is mindful that whether harassment is so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury. *See, e.g., Passananti v. Cook County*, 689 F.3d 655, 669 (7th Cir. 2012). The Court is equally aware that at this stage, neither side has yet had the benefit of discovery. At the pleading stage, however, Ross has not pled conduct severe or pervasive enough to constitute an actionable hostile work environment as a matter of law or to entitle him to discovery. Discovery is unnecessary for Ross to characterize events he personally observed and experienced. Ross's hostile work environment claim therefore must be dismissed, this time with prejudice.

### B. Racial Discrimination

Title VII also makes it unlawful for an employer to "refuse to hire…or otherwise to discriminate against any individual…because of such individual's race." 42 U.S.C. § 2000e–2(a)(1). A claim of racial discrimination requires direct or indirect proof that an employer took an adverse action against the plaintiff because he or she belongs to a protected class. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013); *see also Hitchcock v. Angel Corps, Inc.,* 718 F.3d 733, 737 (7th Cir. 2013). In order to establish a *prima facie* case for racial discrimination, whether

under the direct or indirect standard of proof, a plaintiff must show that (1) he or she is a member of a protected class; (2) he or she was meeting the employer's legitimate expectations; (3) he or she subsequently suffered an adverse employment action; and (4) that at least one similarly situated employee, not in the plaintiff's protected class, was treated more favorably. *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir. 2011). An adverse employment action may, in certain circumstances, be proven by the existence of a hostile work environment. *See, e.g., Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 745 (7th Cir. 2002); *Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 462–63 (7th Cir. 2002).

Count I of Ross' amended complaint is entitled "Title VII – Racial Discrimination and Hostile Work Environment." Beyond the title, however, it is unclear to the Court, as it was with Ross' original complaint, whether Ross intends to assert a claim for racial discrimination separate from his hostile work environment claim. Count I only describes the latter. [ECF No. 31, ¶¶ 60-66] ("Argonne committed an unlawful employment practice by subjecting Ross to a hostile work environment…Argonne knew of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment…"). Nor does Ross' response to the Motion to Dismiss currently before the Court provide any clarity, as Ross exclusively focuses on the hostile work environment created by Kara's discriminatory conduct while discussing the basis of his racial discrimination claim. [ECF No. 44, p. 2-4] ("…Hyland became the Fire Chief and was aware of the racial harassment as was Argonne, that the Plaintiff endured as a result of Kara's actions.") (Ross "feels threatened when working with Kara on his shift; and, thus, he uses his sick time to avoid that interaction since Argonne is forcing him to work with his harasser.").

To the extent Ross is relying upon the hostile work environment to prove he suffered an adverse employment action, his racial discrimination claim must fail based on the Court having

found that the work environment at Argonne was not actionably hostile. Aside from the hostile work environment, Ross has not alleged any additional facts that rise to the level of an adverse employment action such that Ross has pled the elements of a racial discrimination claim.[2] It must therefore be dismissed once again, this time with prejudice.

### II. Counts II and VI: Retaliation Claim

In order to make out a claim for retaliation, Ross' amended complaint must allege that Ross engaged in statutorily protected activity, Argonne took a materially adverse action against him, and the protected activity and adverse action were causally connected. *Gracia v. SigmaTron Int'l, Inc.,* 842 F.3d 1010, 1019 (7th Cir. 2016); *Ripberger v. Corizon, Inc.,* 773 F.3d 871, 881 (7th Cir. 2014); 42 U.S.C. § 2000e-3(a). With respect to Ross' IHRA retaliation complaint, Illinois courts employ the same analytical framework as Title VII. *Frey v. Hotel Coleman,* 141 F. Supp. 3d 873, 883 (N.D. Ill. 2015) (citing *All Purpose Nursing Serv. v. Illinois Human Rights Comm'n,* 205 Ill. App. 3d 816, 826 (1990)).

Protected activity encompasses "filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes," or "opposing an unlawful employment practice." *Northington v. H & M Int'l,* 712 F.3d 1062, 1065 (7th Cir. 2013). If an employee engages in such activity, he or she must then suffer a materially adverse action, which is to be distinguished from trivial harms. Materially adverse actions

---

[2] Ross' amended complaint does not allege adverse employment actions in support of his racial discrimination claim, beyond the existence of a hostile work environment itself. Only in the context of his retaliation claim does he allege he suffered other adverse actions, such as "loss of sick time and monetary value of such, and loss of managerial responsibilities and authority." [ECF No. 31, ¶¶ 69-71]. The Court addresses those alleged adverse employment actions in the context of Ross's retaliation claim and incorporates its analysis, as applicable, in its holding here that Ross failed to demonstrate an adverse employment action as a necessary element of his racial discrimination claim.

encompass those which may well have dissuaded a reasonable worker from action such as making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry.,* 548 U.S. 53, 68 (2006). And while the degree of harm suffered by the employee is judged by an objective standard, context matters. *Id.* at 68-69. A "change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Id.* at 69. This adverse action must then be causally connected to the employee's protected activity, meaning the desire to retaliate was the but-for cause of the challenged employment action." *Gracia,* 842 F.3d at 1019, quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

Aided by the standard of review at this early stage, Ross' amended complaint establishes that he engaged in statutorily protected activity at Argonne. In 2013, Ross brought Kara's racially-motivated conduct to the attention of Argonne's human resources department. [ECF No. 31, ¶ 26]. In 2017, Ross raised concerns in at least three separate verbal and written communications with Chief Hyland. [ECF No. 31, ¶¶ 31, 38, 39]. On September 2, 2017, he filed charges with the Equal Employment Commission ("EEOC"). [ECF No. 31, ¶ 2]. In 2018, Ross also directly raised concerns to another employee at Argonne, Kim Mandekich, about racially-motivated harassment he perceived at Argonne. [ECF No. 31, ¶ 57]. Individually and in the aggregate, these attempts to address perceived race discrimination are statutorily protected. *See, e.g., Northington,* 712 F. 3d at 1065 (where the harassment itself is a purported violation of Title VII, an employee's complaints qualify as a protected activity).

Although Ross may have engaged in statutorily protected activity, he again fails to set forth any facts, or reasonable inferences therefrom, to support the conclusion that he suffered materially adverse action as a result of that statutorily protected activity. Ross' amended complaint attempts to lay out adverse employment actions of an identical character to those alleged in his first

complaint; indeed, many are simply repeated verbatim. [ECF No. 31]. They include allegations that Ross used at least 120 hours of sick time to avoid working with Kara [¶53], received a verbal reprimand for sending an email as opposed to making a phone call [¶51], was threatened with reprimand if he continued to deny Kara's trade requests [¶¶ 44, 52], received an 'insulting' comment on his performance appraisal that invited him to "purchase and read one book on grammar to help keep [his] correspondence error-free" [¶47], was not informed of a meeting for battalion chiefs on January 24, 2018 [¶54], had further training recommended for inaccurate time entries on his shift [¶55], was no longer responsible for personnel lockers or firefighter's clothing and gear [¶56], and was told he should just retire [¶58].

Ross' strongest argument that he suffered an adverse employment action rests with his loss of sick time and modification of his job responsibilities. Neither, however, is persuasive here. As the Court cautioned in its previous opinion, the loss of some benefits – in this case, sick hours – is not an adverse employment action. *Tolliver v. PPG Indus., Inc.,* 2012 WL 1982702, at *3 (C.D. Ill. 2012) (plaintiff did not show a material adverse employment action where she was denied vacation days, requests to change days off work, shift hours, and compensatory time); *see also, Matthews v. Potter,* 2010 WL 5060246, at *5 (N.D. Ill. 2010) (plaintiff's loss of benefits, i.e. exhausting her paid leave and not returning to work, was not an adverse employment action). This is especially true where Ross voluntarily relinquished those hours, albeit to avoid the "unpleasant alternative[]" of working with Kara. *Graehling v. Vill. of Lombard*, 1994 WL 698525, at *8 (N.D. Ill. 1994); *see also, Markose v. Ill. Dep't of Human Servs.,* 2005 WL 233813, at *9 (N.D. Ill. 2005) (an employee being placed on involuntary, paid administrative leave for one week did not rise to the level of a materially adverse employment action where she failed to allege any resulting damage to her career or finances).

Ross charges in his amended complaint that, as a chronological matter, his job responsibilities changed after he engaged in some protected activity. Yet even if, after engaging in protected activity, Ross was the only battalion chief to have his responsibility for personnel lockers or firefighter's clothing and gear redelegated, this does not constitute a material adverse employment action. "[A] mere inconvenience or an alteration of job responsibilities" is not enough; rather, it must be significant change in responsibility that, for example, alters an employee's ability to advance within the company, cuts that employee's hours, or reduces their pay. *Nichols v. Southern Ill. Univ. Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007); *see also, Lowe's Home Ctrs.*, 2009 WL 3824610, at *4 (N.D. Ill. 2009). Ross still holds the same supervisory position as he did at the time he engaged in each instance of protected activity and has suffered no change in rank. *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132 (7th Cir. 1993) (even a change in title from assistant vice-president and manager of one branch of a bank to a loan officer position at a different branch did not, by itself, constitute an adverse employment action); *see also, Oest v. Ill. Dep't of Corrections,* 240 F.3d 605, 612-13 (7th Cir. 2001) (a less distinguished title might, depending on the circumstances, suggest a materially adverse change). He has suffered neither a change in schedule, nor in pay. More importantly, the character of the altered responsibilities is minor. Managing personnel lockers and ordering clothing and gear simply do not go to the heart of Ross' responsibilities as a battalion chief, which the Court estimates include, among other things, fighting fires, and supervising firefighters on his shift in a way that ensures their safety but that of the community as well.

Nor are Chief Hyland's warnings of possible corrective action and threats of future reprimand of the character of an adverse employment action. An adverse employment actions is a tangible job consequence. It must go beyond mere speculation or attempts to counsel an employee

about potential issues down the road. *Watson v. Potter*, 2009 WL 424467, at \*6 (N.D. Ill. 2009); *see also, Lucas v. Chicago Transit Authority*, 367 F.3d 714, 731 (7th Cir. 2004) ("there must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit.") (citing *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998)). Yet Ross' amended complaint is replete with the same type of speculation as in his original complaint. It does not allege that Ross actually received corrective action of any kind, beyond a single, verbal warning for sending an email to Chief Hyland as opposed to making a phone call, despite the fact that other battalion chiefs have not been reprimanded for the same. Whether or not this single reprimand, or Chief Hyland's other threats of corrective action, was undeserved is irrelevant. *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir. 1996) ("The dispositive question in our case is not whether [the plaintiff's] performance evaluations were undeservedly negative, but whether even undeserved poor evaluations can alone constitute [a material adverse employment action]," which the court concluded they could not). An admonishment by an employer simply does not qualify as an adverse employment action, let alone one that is material. *See, e.g., Bass v. Joliet Pub. Sch. Dist. No. 86,* 2013 WL 1181497, at \*7 (N.D. Ill. 2013) (mere written reprimands are not adverse employment actions), aff'd, 746 F.3d 835 (7th Cir. 2014) (holding that while the plaintiff did not challenge the district court's conclusion that written reprimands do not constitute adverse employment actions, "[f]or what it is worth, the law would have been against her in any event."); *Ribando v. United Airlines, In.,* 200 F.3d 507, 511 (7th Cir. 1999).

The fact that Ross was excluded from the January 24, 2018 meeting also is insufficient, as Ross has not pled any facts from which the Court could infer that the meeting was in any way material or that his exclusion resulted in any tangible job consequence. *Johnson-Carter v. B.D.O.*

*Seidman, LLP,* 169 F. Supp. 2d 924, 939 (N.D. Ill. 2001) (non-invitation to several meetings did not materially affect the plaintiff's employment). Unfortunately, "not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996). Ross argues repeatedly that he suffered negative health effects as a result of the workplace interactions he had with Kara in 2017; namely, that he felt threatened, which led to loss of sleep, hypertension, and anxiety. The Court is not unsympathetic to the impact Kara's behavior has had Ross' health. However, the subjective effects of any alleged harassment do not advance Ross' burden of proving a material adverse employment action, as the standard is an objective one, and in any event, Kara's conduct is not an "employment action."

The Court need not address, therefore, whether the protected activity Ross engaged in was causally connected to the adverse action Ross alleges. The employment actions alleged, both individually and in the aggregate, are neither material nor adverse. Ross' retaliation claim fails as a result and is therefore dismissed, this time with prejudice.

### III. Counts III and VII: Age Discrimination

Ross next alleges that Argonne discriminated against him based on his age. In order to establish a *prima facie* case for indirect age discrimination – the only cause of action tangentially related to the facts in Ross' amended complaint – Ross must demonstrate that he was in a protected age group, he was performing according to his employer's legitimate expectations, he suffered an adverse employment action, and similarly situated, substantially younger employees were treated more favorably. *Biolchini v. General Elec. Co.,* 167 F.3d 1151, 1153–54 (7th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

In support of his age discrimination claim, Ross has done no more than set forth a "formulaic recitation of the elements" of his cause of action. *Iqbal,* 556 U.S. at 662. He has not

provided any information to the Court regarding the age of any other individual at Argonne such that the Court could analyze whether Ross was treated differently than other similarly situated, substantially younger employees. Nor has he established that he suffered any adverse employment action at all, let alone on the basis of his age. *Tamayo v. Blagojevich,* 526 F.3d 1074, 1084 (7th Cir. 2008) (a plaintiff must allege that he suffered a specified adverse employment action on the basis of his age). Beyond merely stating how old he is, Ross alleges only one fact even remotely age-related: that Chief Hyland told Ross he "should just retire." However, Ross did not, in fact, retire as a result of Chief Hyland's comments and is still gainfully employed as a battalion chief at the Argonne Fire Department. This single, age-related comment, therefore, cannot form the entire basis of an age discrimination claim – a deficiency which Ross perhaps recognizes, having chosen to remain silent regarding his age discrimination claim in his response to the instant Motion. [ECF No. 44]. For all these reasons, Ross has again failed to meet the elements of an age discrimination claim and that claim is dismissed with prejudice.

### IV. Remaining Common Law Counts: Intentional Infliction of Emotional Distress, Negligent Retention, and Respondeat Superior

Consistent with the Court's previous opinion, as well as the above dismissal of Ross' hostile work environment and racial discrimination claims, Ross' intentional infliction of emotional distress claim is preempted by the IHRA and is therefore moot. *See Mosley v. McDonald's Corp.*, 2006 WL 3541872, at *3 (N.D. Ill. 2006); *Sanlap v. Lasalle Bank, FSB,* 345 F.3d 515, 519 (7th Cir. 2003). The "legislature intended the [IHRA], with its comprehensive scheme of remedies and administrative procedures, to be the exclusive source for redress of alleged human rights violations." *Mein v. Masonite Corp.,* 109 Ill. 2d 1, 7 (Ill. 1985). As a result, where a claim of intentional infliction of emotional distress is "inextricably linked" to a civil rights violation such as racial discrimination or a hostile work environment, it is preempted by the IHRA.

21

*E.E.O.C. v. Foster Wheeler Constructors, Inc.,* 1998 WL 850810, at *3 (N.D. Ill. 1998). However, "mere factual overlap is not decisive." *Arnold v. Janssen Pharmaceutical, Inc.*, 215 F.Supp.2d 951, 955 (N.D. Ill. 2002). Rather, preemption is contingent on whether "a plaintiff can establish the necessary elements of the tort independent of any legal duties created by the [IHRA]." *Santos v. Boeing Co.*, 2004 WL 1384724, at *2 (N.D. Ill. 2004) (citing *Maksimovic v. Tsogalis*, 177 Ill. 2d 511, 519 (Ill. 1997)). "Otherwise, a federal court has no jurisdiction to adjudicate state tort claims that, in essence, seeks the same redress a plaintiff could seek in a claim for a civil rights violation pursuant to the IHRA." *Papenfuss v. Butitta Bros. Auto.*, 2019 WL 1168107, at *9 (N.D. Ill. 2019).

Here, there is no foundation for Ross' emotional distress claim separate from the discriminatory nature of Kara's conduct. *See, e.g., Westphal v. City of Chicago*, 8 F. Supp. 2d 809, 812 (N.D. Ill. 1998); *Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000) (dismissing plaintiff's intentional infliction of emotional distress claim because defendant's comments were offensive only for referring to plaintiff's disability). That is, Kara's alleged "harassing and threatening" actions, such as the puppet incident in 2013 or the verbal comment in 2017, are offensive to the extent they refer to Ross' race. [ECF No. 31, ¶ 78]. Kara's racially-based actions and comments are therefore inextricably linked to Ross' racial discrimination and hostile work environment claims, and as a result, Ross' intentional infliction of emotional distress claim is preempted by the IHRA and therefore dismissed, with prejudice.

The IHRA also preempts Ross' negligent retention action, as it is inextricably linked to the racial discrimination and hostile work environment allegations. *Geise v. Phoenix Co. of Chi.., Inc.,* 159 Ill.2d 507 (Ill. 1994). In order to stand on its own, a negligent retention action must trigger independent common law duties. *See, e.g., Ishkhanian v. Forrester Clinic S.C.,* 2003 WL 21479072, at *4 (N.D. Ill. 2003) (holding that plaintiff's claim for negligent retention did not rely

entirely on rights established by the IHRA where it was "instead predicated on an independent common law duty to protect an employee from assault and battery"). Ross' negligent retention claim fails in this regard, as it alleges Kara was unfit for the position of firefighter as a direct and sole result of his racially-based conduct. [ECF No. 31, ¶¶ 97-100]. Indeed, Ross' amended complaint affirmatively states that Argonne knew or should have known that Kara was unfit to be a firefighter "after the 2013 incident," an incident that is offensive due to its racial character. [ECF No. 31, ¶ 99]. Therefore, because the legal duties created by the IHRA form the sole basis of Ross' negligent retention claim, it is dismissed with prejudice.

Similarly, Ross' claims of vicarious liability cannot survive based on the Court's above ruling. "[V]icarious liability is not itself a claim or cause of action." *Wilson v. Edward Hosp.,* 2012 IL 112898, ¶ 24 (Ill. 2012); *Simon v. Nw Univ.,* 183 F. Supp. 3d 908, 919 (N.D. Ill. 2016). Given Ross' claims of independent, underlying tortious acts have been dismissed, Ross' respondeat superior claim cannot survive.

## CONCLUSION

For all the reasons discussed above, Defendants' Motion to Dismiss is granted with prejudice as to all counts.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 5, 2019