**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **JIMMY ROSS,** | |
| **Plaintiff,** | **No. 18 CV 4200** |
| **v.** | |
| **UCHICAGO ARGONNE, LLC, and Fire Chief GEORGE HYLAND, Individually and in his Official Capacity,** | **Jeffrey T. Gilbert**<br>**Magistrate Judge** |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on UChicago Argonne, LLC's ("Argonne") and Fire Chief Hyland's ("Chief Hyland") (together, "Defendants") Motion to Dismiss Plaintiff's Second Amended Complaint. [ECF No. 81]. On November 27, 2019, the Court, over Defendants' objections, granted Plaintiff Jimmy Ross ("Ross") leave to file his second amended complaint, [ECF No. 76], in which Ross alleges Defendants subjected him to a hostile work environment and retaliated against him for complaining about it in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981. [ECF No. 86]. For the reasons discussed below, Defendants' Motion is granted with prejudice with respect to Counts II and IV of the second amended complaint alleging unlawful retaliation and is denied with respect to Counts I and III alleging a hostile work environment.

## I.    BACKGROUND

On December 10, 2018 and again on August 5, 2019, the Court dismissed Ross's original and first amended complaints, respectively, for failure to state a claim under Federal Rule of Civil

Procedure 12(b)(6). [ECF Nos. 30, 46]. Both complaints generally included federal and state law claims for a hostile work environment, unlawful retaliation, age discrimination, intentional infliction of emotional distress, negligent retention, and a claim against Argonne under a *respondeat superior* theory. Because the facts pled in support of the above allegations did not entitle Ross to relief, even under the lenient standard of review that applies at the motion to dismiss stage under Rule 12(b)(6), the Court dismissed both complaints in their entirety.

After the Court dismissed Ross's complaint for the second time, Ross appealed to the Seventh Circuit. Ross voluntarily dismissed the appeal shortly thereafter pursuant to Federal Rule of Appellate Procedure 42(b) when the Seventh Circuit questioned whether it had jurisdiction because Richard Kara ("Kara"), a previously named defendant, had not consented to the jurisdiction of a United States Magistrate Judge under 28 U.S.C. § 636(c). [ECF Nos. 57, 62]. Ross has since dismissed Kara as a defendant in this lawsuit. [ECF No. 70]. Ross, Argonne, and Chief Hyland, now the only parties to the case, all have consented to this Court's exercise of jurisdiction for all further proceedings pursuant to 28 U.S.C. § 636(c). [ECF Nos. 11, 70, 71]. With the consent issue now resolved, this Court can properly turn to the merits of Defendants' third motion to dismiss under Rule 12(b)(6). [ECF Nos. 81, 82].

At issue now is the sufficiency of Ross's second amended complaint. [ECF No. 86]. Ross has pared his allegations down to the following four claims: a race-based hostile work environment under Title VII against Argonne[1] (Count I), [ECF No. 86] at 16-18, retaliation under Title VII against Argonne (Count II), [ECF No. 86] at 18-19, a race-based hostile work environment under Section 1981 against Argonne and Chief Hyland (Count III), [ECF No. 86] at 19-20, and retaliation under Section 1981 against Argonne and Chief Hyland (Count IV), [ECF No. 86] at 20-21. The

---

[1] Based on Ross's representation that he "agrees to dismiss Hyland from the Title VII claims," [ECF No. 88] at 1, the Court will consider any claims arising under Title VII as pertaining only to Argonne.

2

factual allegations that underlie these causes of action track broadly with those set forth in Ross's original and first amended complaints. The Court assumes some familiarity with the general subject matter of Ross's claims given those two prior opinions and it will not regurgitate all of Ross's allegations for a third time. *See generally Ross v. Univ. of Chicago,* 2018 WL 6448464 (N.D. Ill. 2018); *Ross v. UChicago Argonne, LLC,* 2019 WL 3562700 (N.D. Ill. 2019). Instead, the Court will begin by considering what has changed in the second amended complaint currently before the Court.

Ross now alleges not only that he is currently the only African American member of the Argonne Fire Department, but that he has been the sole African American firefighter at Argonne for over twenty years. [ECF No. 86] at ¶ 1. Ross further supplemented his previously vague descriptions of the black-faced puppet that Kara allegedly hung in his locker in 2013 with a photograph depicting the racially charged nature of that puppet. [ECF No. 86] at 29. In 2013, Ross also alleges that Kara began calling him a "Black M***F***." [ECF No. 86] at ¶ 29. After Ross reported the 2013 puppet incident to his superiors, Ross and Kara did not work on the same shift for a few years, for reasons described in the Court's prior opinions and discussed again below. When they were scheduled to work on the same shift again beginning in 2017, Kara picked up where he left off and continued to call Ross a "Black M***F***," stared at him in a hostile manner, and attempted to elbow Ross in the ribs to start a physical altercation in the workplace. [ECF No. 86] at ¶ 60(a).

Ross also provides further context to his and Kara's employment relationship in his second amended complaint. He explains that in the early 2000s, he and Kara worked together at the Richton Park Fire Department until Kara was fired in 2001 because Ross complained that Kara was using racially charged language to refer to Ross and other African American firefighters. [ECF

No. 86] at ¶¶ 26-27. Ross also adds that in 2003, while both he and Kara were working at Argonne, Kara told Ross that he was only promoted to lieutenant "because he was black." [ECF No. 86] at ¶ 28.

Finally, Ross added allegations that after Chief Hyland became fire chief in 2016, he manipulated the overtime system in place at Argonne beginning in early 2017 to "ensure Kara worked in close proximity with Ross overnight, when Ross was most vulnerable." [ECF No. 86] at ¶ 52. Ross alleges that Chief Hyland allowed Kara to work overtime on Ross's shifts instead of other firefighters who were more eligible than Kara for overtime under department rules because they had worked less hours on a prior shift. [ECF No. 86] at ¶¶ 52-53. Ross explains this was because of "Chief Hyland's own racial bias towards Ross" and desire to "antagonize Ross" as further evidenced by Chief Hyland repeatedly pressuring Ross to retire. *Id.* Ross also adds that in 2017 and 2018, he complained to three senior officials at Argonne that Chief Hyland was allowing Kara to work on the same shift as Ross in violation of the commitment made by Chief Hyland's predecessor, Chief Patterson, in 2013 that Kara would not be assigned to work on Ross's shifts, and Ross asserts that Chief Hyland thereafter increased his efforts to force Kara and Ross to work together. [ECF No. 86] at ¶¶ 55-56.

## II.    ANALYSIS

### A.    Standard of Review

Defendants have renewed their Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). As in its previous two opinions, the Court accepts all well-pleaded facts in Ross's complaint as true and draws all reasonable inferences from those facts in his favor. *Yeftich v. Navistar, Inc.,* 722 F.3d 911, 915 (7th Cir. 2013); *Anchor Bank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). In reviewing the sufficiency of the complaint, the Court must scrutinize the factual

4

allegations to determine whether they plausibly suggest, and are not merely consistent with, an entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Making this plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

To survive a motion to dismiss, the complaint must contain a short and plain statement of the claim that provides the defendant with fair notice of what the claim is. FED.R.CIV.P. 8(a)(2); *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555. The claim for relief must be plausible on its face, which occurs "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Plausibility, however, demands more than mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* Rather, the factual allegations in the complaint must be sufficient to raise the possibility of relief above a "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Therefore, dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In particular, the Court may "reject sheer speculation, bald assertions, and unsupported conclusory statements" in evaluating a claim under Rule 12(b)(6). *Taha v. International Brotherhood of Teamsters, Local 781,* 947 F.3d 464, 469 (7th Cir. 2020) (citing *Yeftich*, 722 F.3d at 915).

### B.   Hostile Work Environment Claims under Title VII and Section 1981 (Counts I and III)

Ross alleges he suffered a race-based hostile work environment at Argonne in violation of Title VII, 42 U.S.C. § 2000e et seq., and he has added a similar claim arising under 42 U.S.C. § 1981. Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or

national origin." 42 U.S.C. § 2000e–2(a). Section 1981 protects the right of all persons to make and enforce contracts regardless of race, and courts generally apply the same framework in evaluating race-based hostile work environment claims under both statutes. *Egonmwan v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 845, 850 n. 7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983.") (citing *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971, 976 (7th Cir. 2006)).

In order to prevail on a claim for a hostile work environment, a plaintiff must show that "he is a member of a class protected by the statute," that "he has been subjected to a hostile work environment," and that he was subjected to this hostile work environment "on account of [his] membership in the protected class." *Abrego v. Wilkie*, 907 F.3d 1004, 1012 (7th Cir. 2018) (quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013)). An actionably hostile work environment is one in which: "(1) [the plaintiff] was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability." *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 476 (7th Cir. 2004); *see also, Robinson v. Perales,* 894 F.3d 818, 828 (7th Cir. 2018).

In evaluating whether the harassment created an intimidating, hostile, or offensive working environment, the Court "must consider the severity of the alleged conduct, its frequency, whether it is physically threatening or humiliating (or merely offensive), and whether it unreasonably interferes with the employee's work performance." *Robinson,* 894 F.3d at 828. A workplace "need not be hellish to constitute a hostile work environment." *Jackson v. County of Racine,* 474 F.3d

493, 500 (7th Cir. 2007); *see also Gates v. Bd. of Educ. of the City of Chicago,* 916 F.3d 631 (7th Cir. 2019). Rather, a single incident, if severe enough, may be sufficient to establish a hostile work environment. *See, e.g., Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999). "Conversely, conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson*, 474 F.3d at 499. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself…Relevant evidence must be considered and irrelevant evidence disregarded." *Johnson v. Advocate Health & Hosps. Corp.,* 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

Although it is a close question, the allegations contained within Ross's second amended complaint and the inferences that reasonably can be drawn from them at the pleading stage plausibly suggest that Ross may be entitled to relief for his hostile work environment claims under Title VII and Section 1981. At the very least, the additional facts pled in Ross's new complaint raise the possibility of relief above the mere "speculative level" that characterized Ross's first two complaints. *Concentra Health Servs., Inc.,* 496 F.3d at 776. Ross has adequately pled facts in support of each element of his hostile work environment claim; namely, that he is a member of a protected class, was subject to unwelcome harassment based on his race, the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being, and that there is a basis for employer liability. The Court addresses each element in turn.

Ross is African American and therefore a member of a protected class. *Johnson,* 892 F.3d at 895. Ross also alleges facts sufficient to show that he was subject to unwelcome harassment at Argonne because of his membership in that protected class. The overtly racial character of the

2013 puppet incident, which the Court has considered in ruling on Defendants' Motion as discussed below, coupled with allegations that Kara repeatedly called Ross a "Black M***F***" in 2013, 2017, and 2018, and engaged in physically and psychologically threatening conduct, [ECF No. 86] at ¶¶ 29, 30, 60(a), are sufficient at the pleading stage to establish that the alleged harassment was racially motivated. The salient question in this case is now, and always has been, whether this racially motivated conduct is severe or pervasive enough to constitute an actionable hostile work environment. Aided heavily by the standard of review at this preliminary stage of litigation, the Court finds that Ross has overcome this hurdle with his third attempt to state a legally cognizable claim as explained below.[2]

Ross's earlier attempts to state a hostile work environment claim rested on three isolated incidents: (1) in 2013, Kara made racially-based comments towards Ross and hung a black-faced puppet in Ross's locker; (2) in 2017, Kara worked a shift with Ross for the first time since 2013 and said to Ross, "let the games begin," and (3) in 2017, Kara had a conversation with Ross in which Kara accused Ross of failing to order a Maltese cross for his uniform. Only one of these incidents, as pled at the time, had an overt racial character or purpose. By contrast, the second amended complaint outlines an arguably severe or pervasive continuing course of racially motivated harassment that, if true, could raise a legally cognizable claim for a hostile work environment. *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833 (7th Cir. 2015); *see generally, Twombly*, 550 U.S. at 558.

Specifically, Ross now paints a much clearer picture of a severe or pervasive hostile work environment perpetrated primarily by Kara, but also encouraged by Chief Hyland and Argonne. Ross now alleges that Kara has a long history of racially motivated animosity towards him, a fact

---

[2] The Court notes that Ross hired new counsel between the dismissal of his first amended complaint and the filing of his second amended complaint. [ECF No. 48].

that provides more context for Ross's allegations. In 2001, when both Ross and Kara worked at the Richton Park Fire Department, Kara was fired because Ross complained that Kara was using racially charged language to refer to Ross and other African American firefighters. [ECF No. 86] at ¶¶ 26-27. As it pertains to Ross's and Kara's employment at Argonne, as far back as 2003, Kara told Ross that he was only promoted to lieutenant "because he was black." [ECF No. 86] at ¶ 28. In 2013, Kara began calling Ross a "Black M***F***" and hung a black-faced puppet in Ross's locker. [ECF No. 86] at ¶¶ 29-30. Ross, who is originally from the deep south, felt threatened by the hanging puppet, as he believed it was meant to evoke memories of the Jim Crow era and the Ku Klux Klan planting burning crosses on the lawns of African Americans. [ECF No. 86] at ¶ 30. Whereas Ross's previous descriptions of the puppet were somewhat vague, any ambiguity as to the racially based character or severity of the threat intended by hanging the puppet in Ross's locker in 2013 is cleared up by the photograph now attached to Ross's second amended complaint. The photograph is reproduced below. [ECF No. 86] at 29.



In or about April 2016, Chief Hyland replaced Chief Patterson, who had previously prevented Kara from working the same shifts as Ross because of the puppet incident. [ECF No. 86] at ¶¶ 36-39. Ross alleges that Chief Patterson promised him after the 2013 puppet incident that Kara would be barred permanently from working on a shift with Ross. [ECF No. 86] at ¶¶ 36-37. But Ross alleges this promise was illusory. Behind the scenes, Chief Patterson, on behalf of Argonne, only memorialized that shift swaps would have to be approved by the Fire Chief, not that Kara was prohibited from working with Ross ever again. [ECF No. 86] at ¶ 38.

To Ross's dismay, after Chief Patterson retired, his successor, Chief Hyland, began allowing Kara to trade onto Ross's shifts for the first time since 2013. [ECF No. 86] at ¶¶ 39-40. Ross alleges that when Kara was allowed to work a shift with him for the first time in years, Kara immediately threatened to "let the games begin," which Ross interpreted as an unequivocal indication from Kara that he was going to pick up where he was forced to leave off in 2013. [ECF No. 86] at ¶ 41. Kara continued to call Ross a "Black M***F***" in 2017 and 2018, and took advantage of the new, more lenient scheduling arrangements to stare at Ross in a hostile manner and attempt to elbow Ross in the ribs to provoke a physical altercation. [ECF No. 86] at ¶ 60(a). These incidents, in the Court's view, rise above mere "[o]ffhand comments, isolated incidents, and simple teasing" that have been rejected as a basis for a hostile work environment claim. *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 840-41 (7th Cir. 2009). Nor under the circumstances of this case does the Court agree with Defendants that Ross has alleged only "stray remarks and the random use of a racial epithet" that the Seventh Circuit has cautioned may be insufficient to support a hostile work environment claim. *Lilly v. Roadway Express, Inc.,* 6 F. App'x 358, 359 (7th Cir. 2001).

10

Chief Hyland also is now alleged to have manipulated overtime systems in place at Argonne to "ensure Kara worked in close proximity with Ross overnight, when Ross was most vulnerable," [ECF No. 86] at ¶ 52, because of "Chief Hyland's own racial bias towards Ross" and desire to "antagonize Ross." [ECF No. 86] at ¶¶ 52-53. These new allegations provide a necessary element of racial character to Chief Hyland's actions, *Vance v. Ball State Univ.,* 646 F.3d 461, 470 (7th Cir. 2011), that was not pled, or even suggested, in Ross's first two complaints.

Although the Court has considered the nature of the 2013 incidents in evaluating the severity of the alleged hostile work environment at Argonne, as discussed in more detail below, Ross's claims arising out of conduct in 2017 and 2018 arguably are sufficient on their own to support a hostile work environment claim. At the motion to dismiss stage, the Court must take as true the allegations that Ross endured numerous racially charged slurs and physical threats, exacerbated by his supervisor, at Argonne in 2017 and 2018. And although each incident may not be sufficient on its own to create an intolerable work situation, the Court must consider the totality of Ross's factual allegations and the work environment in which they happened. *Pierce v. Ill. Dept. of Human Serv.,* 128 F. App'x 534, 538 (7th Cir. 2005) (permitting a Title VII complaint to proceed based on "jokes referring to race, posting of racist cartoons, offensive language including slurs (plural)"); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

In this regard, it is relevant that Ross and Kara are firefighters who work, eat, sleep, and use the locker room in close quarters together during 24-hour shifts. [ECF No. 86] at ¶ 51; *see, e.g., Gomez v. City of Chicago*, 2017 WL 131565, at *3 (N.D. Ill. 2017). Working in a fire station demands a level of trust, confidence, and respect necessary to overcome potentially life or death situations. [ECF No. 86] at ¶ 22; [ECF No. 88] at 3 ("On every shift Ross must close his eyes and sleep in the presence of his fellow firefighters, and in a fire he must depend on them for his life.").

11

As the Seventh Circuit aptly explained in another case involving a firefighter, it is significant in the hostile work environment context and at the motion to dismiss stage "that the harassment occurred in an atmosphere where firefighters live and serve together and in which mutual interdependence is an essential factor in effectiveness and, at times, survival. Unit cohesion is as important in a firefighting unit as it is on a battlefield or aboard a man-of-war." *Alamo v. Bliss,* 864 F.3d 541, 551 (7th Cir. 2017); *see also, Gomez,* 2017 WL 131565.

Nor is the fact that Kara is Ross's subordinate in the command structure of the Argonne fire department outcome determinative in this case, as Defendants argue it is. That fact along with others, such as that firefighters live and work together in close quarters on 24-hour shifts and that Chief Hyland, Ross's superior, is alleged to have contributed to the hostile work environment in this case, also are relevant to the Court's analysis. The fact that Ross is a Battalion Chief and Kara apparently is a line firefighter is a circumstance that can be explored through discovery, or that a jury ultimately may need to consider in assessing Ross's credibility and the severity or pervasiveness of the allegedly hostile work environment. Kara's subordinate status, therefore, is not in and of itself a fact that completely undercuts Ross's claims as a matter of law. *Alamo,* 864 F.3d at 551 (the reviewing court is required to consider the totality of the plaintiff's factual allegations).

As mentioned above, in evaluating whether Ross has alleged sufficiently severe or pervasive conduct to state a claim for a hostile work environment, the Court has taken into consideration the nature of the 2013 incident in which Kara allegedly hung a black-faced puppet in Ross's locker and that Kara also called Ross a "Black M***F***" in 2013. [ECF No. 86] at ¶¶ 29, 30. Defendants strenuously argue that Ross cannot rely on these incidents to support his hostile work environment claim, as they occurred more than 300 days before Ross filed suit in this case

12

and are not the subject of Ross's complaint filed with the Equal Employment Opportunity Commission ("EEOC") in 2017. [ECF No. 82] at 5-6. Ross does not directly address the statute of limitations issue but he does argue that the conduct in 2013 was so severe that a jury should be allowed to consider it: "[o]nly a jury (not a Court at the pleading stage) can properly decide whether in 2013, Jimmy Ross reasonably found the black-faced puppet strung up in his locker to be a deeply offensive act of racial hostility, a conclusion aggravated by Kara's other efforts to intimidate Ross." [ECF No. 88] at 3.

Defendants are correct that Ross may not be able to rely on the 2013 puppet incident as a stand-alone, discrete discriminatory act. Although he has explained why he did so, Ross waited well over 300 days after the act occurred to sue for that conduct and a claim based only on that incident may be time-barred for that reason. *See, e.g., Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 270 (7th Cir. 2004); *Hardin,* 167 F.3d at 344 (generally, the court may only consider evidence from the 300–day period after an alleged discriminatory action). When there are allegations of continuing violations, however, the Court may look outside the relevant time period. *Hardin,* 167 F.3d at 344; *Dandy,* 388 F.3d 263 (the continuing violation doctrine applies to Title VII as well as § 1981 claims). As the Supreme Court has explained, the continuing violation doctrine "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," but permits "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period…so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105 (2002). The continuing violation doctrine, therefore, potentially is a vehicle by which Ross can put the 2013 puppet incident, as well as the incidents that occurred in 2017 and 2018, before the Court or a jury for a full evaluation of Ross's hostile environment claim.

Ross at least plausibly alleges a pattern and practice of racial discrimination that Argonne continuously failed to address over the years. *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017) ("because the employer—not its employees—must comply with Title VII, so we look to the employer's response to allegations of misconduct rather than the contours of the misconduct itself."). As a result, the 2013 puppet incident, as well as Kara's racially offensive verbal attacks in 2013, and Argonne's response to that conduct may be relevant to Ross's hostile work environment claim under a continuing violation theory. *Id*. at 712; *see also Isaacs v. Hill's Pet Nutrition, Inc.,* 485 F.3d 383, 386 (7th Cir. 2007). Argonne is alleged to have condoned or facilitated a number of overtly racial acts by Kara in 2017 and 2018, all of which are of the same character as what occurred in 2013: derogatory, racially charged language combined with verbal and non-verbal threats to Ross's safety. In 2013, Argonne itself acknowledged that Kara's conduct toward Ross was sufficiently serious or hostile to justify barring Kara from working the same shift with Ross. Yet after a hiatus during which Chief Patterson apparently took it upon himself to strictly enforce a practice under which Kara was not allowed to work with Ross but Argonne did not adopt a policy that would ensure the two would not work together permanently as Chief Patterson allegedly promised Ross, Argonne in 2017 put Ross back in the same situation it implicitly found was not tolerable in 2013.

Chief Patterson was also not the only individual aware of Kara's racially charged conduct and Argonne's promise to follow through on appropriate disciplinary action. According to Ross's second amended complaint, Argonne officials, including Senior Director Gail Stine, were involved in the decision to separate Kara from Ross at the workplace in 2013. Yet despite this involvement, Ross alleges they continuously failed to address the hostile work environment Ross says he endured in 2017 and 2018. [ECF No. 86] at ¶¶ 33, 48, 54-56. Ross further alleges that he did not

learn until after Chief Patterson left Argonne that his practice of not allowing Kara to work the same shifts as Ross was not memorialized in a policy that bound Chief Hyland, his successor. [ECF No. 86] at ¶¶ 33-40.

Accepting all well-pleaded facts as true, as is required at this stage of the case, *Yeftich,* 722 F.3d at 915, the Court is unwilling to say there are no circumstances under which Ross can avail himself of the continuing violation theory as a matter of law. Ross alleges facts that, at the pleading stage, tie the 2013 incidents to the conduct in 2017 and 2018. The Court recognizes that Ross ultimately may not be able to prove the elements of this theory under a less forgiving standard of review, especially given the intervening time period, change in direct leadership at Argonne, and prior disciplinary action taken against Kara. But there is enough of a link at the pleading stage to suggest that the allegations that fall within the relevant statutory period – namely that in 2017 and 2018, Kara told Ross to "let the games begin," repeatedly called Ross a "Black M***F***," that Kara engaged in physically and psychologically threatening conduct, and that Chief Hyland actively worked to "ensure Kara worked in close proximity with Ross overnight, when Ross was most vulnerable," because of "Chief Hyland's own racial bias towards Ross" and desire to "antagonize Ross" – are reasonably related to the 2013 incidents such that the conduct is "part of one unlawful employment practice" and Argonne "may be liable for all acts that are part of this single claim." *Morgan*, 536 U.S. at 118; *Williams v. City of Chicago*, 325 F. Supp. 2d 867, 875 (N.D. Ill. 2004) (conduct was actionable under the continuing violation theory where time-barred acts were sufficiently related to the timely acts). The Court cannot say now that it is "beyond doubt" that relief could not be granted under any set of facts consistent with a continuing violation theory

and a singular unlawful employment practice at Argonne dating back to 2013. *Pierce*, 128 F. App'x at 538.[3]

Although there are cases that hold a plaintiff cannot make out a continuing violation theory when there has been a gap of years between the earlier and later alleged conduct, *see, e.g., Lucas v. Chicago Transit Auth.,* 367 F.3d 714, 727 (7th Cir. 2004), every case depends on its own facts in the end. And the facts at this stage, construed in Ross's favor, ultimately give him a procedural edge. The Seventh Circuit has held, frequently in the context of summary judgement when the relevant facts are more developed, that large gaps of time between incidents prevent a plaintiff from establishing a single employment practice. *Milligan-Grimstad,* 877 F.3d at 712-13. Here, at the motion to dismiss stage, Ross has at least alleged that Argonne failed to act to ameliorate definitively the racial discrimination occurring at Argonne when first put on notice of it in 2013. Ross alleges that even though senior Argonne officials were aware of Kara's conduct as early as 2013, they failed to institute effective, permanent policies to address it. [ECF No. 86] at ¶¶ 33-40. And the alleged conduct in 2013 is essentially the same conduct as Ross alleges occurred in 2017 and 2018 when Argonne allowed Kara to once again trade onto Ross's shifts. [ECF No, 86] at ¶¶ 33-40.[4]

---

[3] Defendants acknowledge the possibility of a continuing violation claim by Ross but argue that the facts pled will not support such a theory in this case. [ECF No. 82] at 5-6; [ECF No. 89] at 2-3. As discussed here, however, the Court disagrees at least at the pleading stage when a plaintiff is given the benefit of doubt. The Court acknowledges that Ross did not argue a continuing violation theory explicitly in his response to Defendants' Motion. But that is not determinative given that the facts Ross has pled might support such a theory.

[4] In the end, facts drive the Court's analysis and ultimate decision. In *Lucas,* for example, the court of appeals rejected the plaintiff's attempt to invoke the continuing violation doctrine because, among other reasons, the plaintiff could not show that discriminatory acts occurred within the relevant statutory period that were connected to discriminatory acts that occurred outside that time period. *Lucas,* 367 F.3d at 725 ("the acts set forth above, which all occurred outside the limitations period, cannot be considered unless Mr. Lucas can point to an act that is part of the same hostile work environment and that falls within the limitations period."). As illustrated by the appellate court's detailed analysis in this and other cases, the

In addition, the continuing violation theory is not the only basis under which the Court can consider the otherwise time-barred 2013 incidents in evaluating Ross's hostile work environment claim. Even where a discrete act may be "time-barred" on its own, it may still be used as "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. The evidentiary inferences from the 2013 puppet incident, Argonne's responses to it, and the fact that Kara picked up where he left off in his harassment of Ross at every opportunity Argonne enabled, can lend credence to Ross's allegations that he endured a severe and pervasive hostile work environment in 2017 and 2018. The Court, therefore, has considered the racial character of the 2013 puppet incident not just through the lens of a plausible continuing violation theory, but also because of its possible relevance as background evidence to support Ross's 2017 and 2018 claims.

As to the final element of Ross's hostile work environment claim, employer liability, Ross alleges that Chief Hyland and three more senior Argonne officials – Gail Stine, Kim Mandekich, and Darryl Howe – were informed of Kara's 2017 comment to "let the games begin," as well as the allegations that Kara called Ross a "Black M***F***" in 2013, 2017, and 2018. [ECF No. 86] at ¶¶ 32, 33, 55, 56. Ross recounts conversations not only about Kara's continuing course of conduct, but also about the detrimental effect it had on Ross's health. Moreover, Ross describes new actions taken by Chief Hyland to not just enable Kara to work the same shifts as Ross on multiple occasions, but to in fact ensure that they worked together during overnight shifts where Ross would be particularly vulnerable. The facts in Ross's second amended complaint plausibly suggest that Chief Hyland, as well as several other employees at Argonne, knew of the alleged harassment by Kara in 2017 and 2018 and failed to address it. This is sufficient to establish a basis for employer liability, at least at the motion to dismiss stage. *See, e.g., Nischan v. Stratosphere*

---

question of whether a plaintiff can invoke the continuing violation doctrine usually requires a detailed fact analysis that often is not appropriate in the context of a motion to dismiss.

*Quality, LLC*, 865 F.3d 922, 930 (7th Cir. 2017) (employers may be liable for the discriminatory acts of coworkers if they are negligent either in discovering or remedying the harassment).

For all these reasons, the Court concludes that Ross has pled facts sufficient to show that "the entire context of the workplace" was hostile such that Ross has a cognizable claim under Title VII and Section 1981. *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). Ross has alleged that he endured an intimidating, hostile, or offensive working environment at Argonne that seriously affected his psychological well-being and caused hypertension, insomnia, and anxiety, some of which requires daily medication. [ECF No. 86] at ¶ 65. Ross's allegations, if true, plausibly describe the type of "sever[e]" language and "physically threatening" circumstances that both the Seventh Circuit and Supreme Court have described as actionably hostile. *Id.* at 551-52; *Harris*, 510 U.S. at 23. "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must ask itself *could* these things have happened, not *did* they happen." *Huri,* 804 F.3d at 833 (emphasis in original). Ross has alleged enough to put Argonne on notice of his claims and the grounds upon which they rest. *Pierce*, 128 F. App'x at 538 (once an employer is on notice of the basis of a Title VII claim, dismissal on the pleadings is only appropriate if it can be said "'beyond doubt' that no relief could be granted under any set of facts consistent with the allegations."). This is all that is required for Ross to survive a motion to dismiss. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago,* 786 F.3d 510, 526 (7th Cir. 2015) (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)).

Whether Ross ultimately will be able to support these allegations under a more demanding legal standard at summary judgment or trial is another question, but not one the Court must answer now. *Huri*, 804 F.3d at 834 ("The pleading standards in Title VII cases are, of course, different from the evidentiary burden a plaintiff must subsequently meet. It may be that [the plaintiff], once

discovery has run its course, cannot produce evidence to survive summary judgment. But that question can safely be postponed to another day."). Ross has met his burden under Rule 12(b)(6) and he is entitled to proceed with his case and pursue discovery designed to support his claims. *Olson v. Champaign Cnty.,* 784 F.3d 1093, 1099 (7th Cir. 2015) (the standard at the motion to dismiss stage simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the allegations).

### C.      Unlawful Retaliation Claims (Counts II and IV)

In order to make out a facially plausible claim for retaliation, Ross must allege that: (1) he engaged in statutorily protected activity, (2) Argonne took a materially adverse action against him, and (3) the protected activity and adverse action were causally connected. *Mollet v. City of Greenfield,* 926 F.3d 894, 896 (7th Cir. 2019); *Robinson,* 894 F.3d at 830; 42 U.S.C. § 2000e-3(a). Courts employ the same analytical framework for Section 1981 and Title VII retaliation claims. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009); *see also CBOCS West, Inc.,* 553 U.S. 442, 445 (2008) (holding that Section 1981 protects the right of all persons to make and enforce contracts regardless of race and authorizes claims for retaliation).

Protected activity encompasses "filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes," or "opposing an unlawful employment practice." *Northington v. H & M Int'l,* 712 F.3d 1062, 1065 (7th Cir. 2013). If an employee engages in such activity, he or she must then suffer a materially adverse action, which is to be distinguished from trivial harm. Materially adverse actions encompass those which would dissuade a reasonable worker from participating in protected activity. *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014); *Burlington N. & Santa Fe Ry.,* 548 U.S. 53, 68 (2006). And while the degree of harm suffered by the employee is judged by an

objective standard, context matters. *Id.* at 68-69. A "change in an employee's work schedule may make little difference to many workers but may matter enormously to a young mother with school-age children." *Id.* at 69. This adverse action must then be causally connected to the employee's protected activity, meaning "the desire to retaliate was the but-for cause of the challenged employment action." *Gracia v. SigmaTron International, Inc.*, 842 F.3d 1010, 1019 (7th Cir. 2016) (quoting *University of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)). "The requirement of but-for causation in retaliation claims does not mean that the protected activity must have been the only cause of the adverse action. Rather, it means that the adverse action would not have happened without the activity." *Carlson,* 758 F.3d at 828 n.1.

Ross alleges in his second amended complaint that he engaged in statutorily protected activity at Argonne and his previous two complaints contained substantially similar allegations of protected activity that also passed muster on this element of a retaliation claim. Specifically, in 2013, Ross brought Kara's racially motivated conduct to the attention of Argonne's human resources department. [ECF No. 86] at ¶¶ 32-33. In 2017 and 2018, Ross raised concerns about Kara's conduct in both verbal and written communications with Chief Hyland and three administrative employees at Argonne: Gail Stine, Kim Mandekich, and Darryl Howe. [ECF No. 86] at ¶¶ 49, 54-56. On September 2, 2017, he filed charges with the EEOC and notified Argonne. [ECF No. 86] at ¶ 57. Individually and in the aggregate, these attempts to address perceived race discrimination on the job are statutorily protected. *See, e.g., Northington,* 712 F.3d at 1065 (where the harassment itself is a purported violation of Title VII, an employee's complaints qualify as a protected activity).

Although Ross has pled facts sufficient to establish that he engaged in statutorily protected activity, his complaint fails, for a third time, to set forth any facts, or reasonable inferences from

the facts he has pled, to support the conclusion that he suffered an actionable adverse action as a result of his statutorily protected activity. In an ultimately futile attempt to meet this standard, Ross alleges two categories that he describes as adverse employment actions: "(1) a hostile work environment, which was aggravated when Chief Hyland encouraged Kara to switch on to Ross's shift causing Ross aggravated phycological [sic] injury; and (2) diminished responsibilities and authority." [ECF No. 86, ¶ 79].

As to the first category, Ross circuitously argues that after he complained that he was the victim of a race-based hostile work environment, Argonne retaliated against him by subjecting him to the very same race-based hostile work environment of which he had already complained. In support of this argument – that an already-existent "hostile work environment" constitutes an "adverse employment action" in the context of a retaliation claim – Ross quotes from a single case: *Gates v. Bd. of Educ. of the City of Chicago,* 916 F.3d 631. In *Gates,* the Seventh Circuit stated that "[s]ubjecting an employee to a hostile work environment counts as an adverse action ("unlawful employment practice") *within the meaning of Title VII's prohibition of race discrimination in 42 U.S.C. § 2000e-(2)(a).*" *Id.* at 636 (emphasis added). Unlawful retaliation claims, however, do not arise under 42 U.S.C. § 2000e-(2)(a), but under 42 U.S.C. § 2000e-(3)(a). *Gates* is therefore wholly inapplicable to the Court's analysis of whether Ross suffered an adverse employment action that could support a retaliation, rather than a hostile work environment, claim.

Instead, Ross's argument that the alleged hostile work environment he endured constitutes an adverse employment action in the retaliation context "appears to be an attempt to circumvent the need to identify an adverse action altogether." *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 987 (N.D. Ill. 2014); *Little v. Illinois Dept. of Public Health,* 2020 WL 1530736, at *16 (N.D. Ill. 2020). As noted above, Ross must plead and prove "but-for" causation to support

a retaliation claim. *Gracia,* 842 F.3d at 1019; *Carlson,* 758 F.3d at 828 n.1. But Ross does not plausibly allege that Argonne encouraged racially discriminatory conduct against Ross because Ross complained to his supervisors and the EEOC in 2017. Rather, Ross merely alleges that Kara and Chief Hyland continued to carry on actions of the same character as those that were occurring before Ross engaged in protected activity.

Ross also has not alleged and cannot prove that his protected activity was "the but-for cause" of an adverse action. *Gracia,* 842 F.3d at 1019. The question in the retaliation context is whether "the adverse action would not have happened without the [protected] activity." *Carlson,* 758 F.3d at 828 n.1. In this case, Ross would have to show that the "adverse action," which Ross claims is the hostile work environment to which he was subjected, would not have existed if Ross had not raised his concerns to Chief Hyland and Argonne officials. *Id.*; *see also Robinson*, 894 F.3d at 834; *Mollet v. City of Greenfield,* 926 F.3d 894, 897 (7th Cir. 2019). But the very premise of Ross's second amended complaint is that he endured a hostile work environment at Argonne before and after he engaged in protected activity. After he engaged in protected activity in 2017, he alleges only that Kara[5] and Chief Hyland carried on with conduct of the same character and frequency as before he engaged in protected activity, including that Chief Hyland continued to allow Kara to trade onto Ross's shifts, [ECF No. 86] at ¶¶ 51(f), 51(g), and allowed Kara to continue calling him a "Black M***F***." [ECF No. 86] at ¶ 60(a). Ross does not allege that Argonne encouraged or perpetrated that hostile work environment because he sounded the alarm

---

[5] Of course, under Title VII and Section 1981, unlawful retaliation occurs when an *employer* takes an adverse employment action against an employee. 42 U.S.C. § 2000e–3(a); *see generally, CBOCS West, Inc.,* 553 U.S. at 445. Kara's individual actions are therefore not relevant to the Court's analysis in the retaliation context, except to the extent they relate to what Argonne did in response. Argonne's conduct was consistent before and after Ross engaged in the alleged protected activity. Further, as discussed below, the actions Ross alleges Argonne took after he filed his EEOC complaint in terms of "diminished responsibilities and authority," and Ross's choice to use his sick time to avoid working shifts with Kara, do not rise to the level of adverse employment actions under controlling law.

on racist conduct occurring at Argonne. Rather, he alleges that Argonne continued to subject him to a hostile work environment despite his sounding the alarm. Ross therefore fails the but-for test. He cannot support a retaliation claim using a pre-existing hostile work environment in the place of an actual "adverse employment action" suffered because he engaged in protected activity.

The second category of adverse employment actions set forth in Ross's second amended complaint involves "diminished responsibilities and authority." The Court previously ruled that allegations of this type, which Ross repeats almost verbatim from his original and first amended complaints, did not rise to the level of adverse employment actions as contemplated by the case law. Although the Court incorporates by reference its previous rulings regarding these alleged "adverse employment actions," it bears discussing with some specificity why the actions alleged in the complaint currently before the Court are again insufficient. The Court therefore addresses each alleged adverse action in turn.

Ross first asserts that after he complained about racial discrimination at Argonne, he was stripped of his responsibility over managing personnel lockers or firefighter's clothing and gear. [ECF No. 86] at ¶¶ 61(a), (c). He further claims that he was excluded from meetings with his battalion on multiple occasions. [ECF No. 86] at ¶ 61(b). These job modifications, Ross asserts, eroded the respect held for him by other members of the department. [ECF No. 86] at ¶ 63. These facts, however, establish no more than what courts have characterized as "mere inconvenience or an alteration of job responsibilities," as contrasted with a significant change in responsibility that, for example, alters an employee's ability to advance within the company, cuts that employee's hours, or reduces their pay. *Nichols v. Southern Ill. Univ. Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007); *see also, Lowe's Home Ctrs*., 2009 WL 3824610, at *4 (N.D. Ill. 2009). The character of the altered responsibilities Ross describes, therefore, is minor in a legal sense. Managing

personnel lockers and ordering clothing and gear simply do not go to the heart of Ross's responsibilities as a battalion chief, especially where Ross still holds the same supervisory position he did at the time he engaged in each instance of protected activity and has suffered no change in rank, schedule, or pay as a result of his complaints to Argonne or the EEOC. *Crady v. Liberty National Bank & Trust Co. of Indiana*, 993 F.2d 132 (7th Cir. 1993) (even a change in title from assistant vice-president and manager of one branch of a bank to a loan officer position at a different branch did not, by itself, constitute an adverse employment action); *see also, Oest v. Ill. Dep't of Corrections,* 240 F.3d 605, 612-13 (7th Cir. 2001) (a less distinguished title might, depending on the circumstances, suggest a materially adverse change).

Nor does Ross's episodic exclusion from "meetings with [his] battalion" rise to the level of an adverse action, as Ross's second amended complaint is again devoid of facts from which the Court could infer that the meetings were in any way material or that his exclusion resulted in any tangible job consequence, other than that the exclusion generally "diminished the department member's respect for Ross." [ECF No. 86] at ¶ 63; *see generally, Johnson-Carter v. B.D.O. Seidman, LLP,* 169 F. Supp. 2d 924, 939 (N.D. Ill. 2001) (non-invitation to several meetings did not materially affect the plaintiff's employment).

Beyond a modification of his day-to-day responsibilities, Ross also characterizes several interactions with Chief Hyland as adverse employment actions. Ross alleges that he received a verbal reprimand for sending an email, [ECF No. 86] at ¶ 60(c), was threatened with reprimand on at least two occasions if he continued to deny Kara's shift trade requests, [ECF No. 86] at ¶¶ 51(d), (e), received an 'insulting' comment on his performance appraisal that invited him to "purchase and read one book on grammar to help keep [his] correspondence error-free," which he believed to be a racially-based insult, [ECF No. 86] at ¶ 60(b), was recommended to receive additional

24

training to address errors in his time entries, [ECF No. 86] at ¶ 60(d), and was told to retire on several occasions. [ECF No. 86] at ¶ 53.

Chief Hyland's warnings of possible corrective action and threats of future reprimand, however, do not constitute adverse employment actions. An adverse employment actions is a tangible job consequence. It must go beyond mere speculation or attempts to counsel an employee about potential issues down the road. *Watson v. Potter*, 2009 WL 424467, at *6 (N.D. Ill. 2009); *see also, Lucas,* 367 F.3d at 731 ("there must be some tangible job consequence accompanying the reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit.") (citing *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir. 1998)). Yet Ross does not allege that he actually received corrective action of any kind, beyond a single, verbal warning for sending an email. An admonishment by an employer simply does not qualify as an adverse employment action, let alone one that is material. *See, e.g., Bass v. Joliet Pub. Sch. Dist. No. 86,* 2013 WL 1181497, at *7 (N.D. Ill. 2013) (mere written reprimands are not adverse employment actions), aff'd, 746 F.3d 835 (7th Cir. 2014) (holding that while the plaintiff did not challenge the district court's conclusion that written reprimands do not constitute adverse employment actions, "[f]or what it is worth, the law would have been against her in any event."); *Ribando v. United Airlines, In.,* 200 F.3d 507, 511 (7th Cir. 1999).

Ross's assertion that he sacrificed at least 120 hours of sick time to avoid working with Kara is arguably his most compelling argument to support a claim that he suffered an adverse employment action, [ECF No. 86] at ¶ 66, but it nevertheless fails for the same reasons explained in this Court's previous two opinions. The loss of some benefits, such as sick hours, does not rise to the level of an adverse employment action. *Tolliver v. PPG Indus., Inc.,* 2012 WL 1982702, at

*3 (C.D. Ill. 2012) (plaintiff did not show a material adverse employment action where she was denied vacation days, requests to change days off work, shift hours, and compensatory time); *see also Matthews v. Potter*, 2010 WL 5060246, at *5 (N.D. Ill. 2010) (plaintiff's loss of benefits, i.e. exhausting her paid leave and not returning to work, was not an adverse employment action). As this Court previously emphasized, this is especially true in this case where Ross voluntarily relinquished those hours, albeit to avoid the "unpleasant alternative[]" of working with Kara. *Graehling v. Vill. of Lombard*, 1994 WL 698525, at *8 (N.D. Ill. 1994) ("Merely because a plaintiff is 'faced with an inherently unpleasant situation in that [his] choice was arguably limited to two unpleasant alternatives does not obviate the voluntariness of [his] resignation.'") (quoting *Christie v. United States,* 518 F.2d 584, 587-88 (Ct. Cl. 1975)).

Insofar as Ross is arguing that the Court should consider the "totality of the circumstances," this approach is limited to hostile work environment claims, which the Court addressed above. *Lewis v. Wilke*, 909 F.3d 858, 868 n.3 (7th Cir. 2018); *Boss,* 816 F.3d at 917-18 (7th Cir. 2016) (explaining that a "totality of the circumstances" approach is limited to hostile work environment claims); *Hall v. City of Chicago,* 713 F.3d 325, 334 (7th Cir. 2013). In the context of unlawful retaliation, materially adverse actions must be considered independently. *Lewis*, 909 F.3d at 868 n.3. The employment actions Ross has alleged, taken as true, are neither material nor adverse. Because Ross has again failed to plead an "adverse employment action," the Court need not proceed to the third element of a retaliation claim and address whether the adverse actions Ross alleges are causally connected to the protected activity in which he engaged.

Ross need not prove at the pleading stage that Argonne retaliated against him, but he must "present a story that holds together," *Runnion,* 786 F.3d at 526, and his "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. For the

reasons discussed above, Ross again has failed to do so, even aided by the standard of review at this early stage of the case. Ross has not been able to plead a legally cognizable retaliation claim despite the three chances he has had to do so. For this reason, Defendants' Motion to Dismiss Counts II and IV is granted with prejudice.

## III.    CONCLUSION

For all the reasons discussed above, Defendants' Motion to Dismiss is granted in part and denied in part. Defendants' Motion is denied as to Counts I and III, except that Ross's request that he be allowed to voluntarily dismiss the claims in Count I and III against Chief Hyland is granted. Those counts against Chief Hyland are dismissed. Counts II and IV are hereby dismissed with prejudice consistent with the above Memorandum Opinion and Order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: April 28, 2020

27