## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JIMMY ROSS,

                 Plaintiff,

       v.

UCHICAGO ARGONNE, LLC, and Fire
Chief GEORGE HYLAND, Individually
and in his Official Capacity,

                 Defendants.

No. 18 CV 4200

Magistrate Judge Jeffrey T. Gilbert

### MEMORANDUM OPINION AND ORDER

Plaintiff Jimmy Ross ("Ross") alleges he faced racial discrimination from his supervisor, Defendant Fire Chief George Hyland ("Chief Hyland"), and a lower-ranking firefighter, Richard Kara ("Kara"), during his time as a Battalion Chief employed by Defendant UChicago Argonne Fire Department ("Argonne"). Kara was originally a named defendant in this action, but Ross voluntarily dismissed him. [ECF No. 70]. On Defendants' motion to dismiss, the Court dismissed two of Plaintiff's four discrimination claims, *Ross v. UChicago Argonne, LLC,* 2020 WL 2041338 (N.D. Ill. 2020), leaving only Counts I and III of the Second Amended Complaint [ECF No. 86] alleging a hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, respectively, pending against Argonne, Ross's employer, and Chief Hyland, his direct supervisor.

Both Defendants now move for summary judgment on the remaining counts of the Second Amended Complaint. [ECF No. 142]. For the reasons explained below, Defendants are not entitled to judgment as a matter of law on the record developed to date. Defendants' motion therefore is denied.

## I.

### LEGAL STANDARD

The Court begins by viewing the facts and making all reasonable inferences in the light most favorable to Ross, the party opposing summary judgment. *Reives v. Illinois State Police,* 29 F.4th 887, 891 (7th Cir. 2022); *Parker v. Four Seasons Hotels, Ltd.,* 845 F.3d 807, 814 (7th Cir. 2017). In the context of a motion for summary judgment, the Court does not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. Rather, the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003).[1]

---

[1] The facts discussed in this Memorandum Opinion and Order are taken from the parties' respective filings in support of and in opposition to Defendants' motion for summary judgment. [ECF No. 144, 145, 148, 149, 156, 160]. To the extent necessary, the Court will refer to Defendants' Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue [ECF No. 144] as Defendants' Statement of Facts ("DSOF"), Plaintiff's Corrected Statement of Additional Facts Requiring Denial of Defendants' Motion for Summary Judgment [ECF No. 160] as Plaintiff's Amended Statement of Facts ("PASOF"), Plaintiff's Response to Defendants' Statement of Uncontested Material Facts [ECF No. 148] as "Plaintiff's Response," and Defendants' Response to Plaintiff's Statement of Additional Facts [ECF No. 156] as "Defendants' Response."

At one time a "rat's nest of surplus tests," summary judgment in the employment discrimination context now presents a singular question: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 764–66 (7th Cir. 2016); *Johnson v. Advoc. Health & Hosps. Corp.,* 892 F.3d 887, 894 (7th Cir. 2018). Summary judgment, therefore, is not appropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, who must "respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 568 (7th Cir. 2017). Inferences supported only by speculation or conjecture will not suffice. *Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 721–22 (7th Cir. 2018). Nor will a mere scintilla of evidence. *Grant,* 870 F.3d at 571.

## II.

## PRELIMINARY MATTERS

Before turning to the merits, the Court must resolve two issues raised by Defendants regarding the summary judgment record. First, Defendants criticize Plaintiff's Response [ECF No. 148] and PASOF [ECF No. 160] because both documents are replete with lengthy, multi-sentence paragraphs containing multiple purported facts, unattributed citations to the record, factual statements that are conclusions and/or not supported by the record citations given,[2] and occasional

---

[2] *See, e.g.,* PASOF [ECF No. 160] at ¶ 15 (use of the conclusory term "racial tension" with no cite to the record), ¶¶ 10, 17, 24, 26.

hearsay. [ECF No. 15] at 4. Defendants argue these filings do not comply with Local Rule 56.1. Defendants' criticisms are well-taken. Plaintiff's Response [ECF No. 148] is not, by any stretch of the imagination, "'a concise response to the movant's statement that [] contain[s] ... a response to each numbered paragraph in the affidavits, parts of the record, and other supporting materials relied upon.'" *Curtis v. Costco Wholesale Corp.,* 807 F.3d 215, 218 (7th Cir. 2015) (quoting N.D. Ill. R. 56.1(b)(3)(B)); [ECF No. 148]. It is often argumentative, evasive, and devoid of factual support, all in plain violation of Local Rule 56.1. *See, e.g.,* [ECF No. 148] at ¶¶ 15, 22, 23, 25; *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,* 529 F.3d 371, 382 n. 2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts.").

PASOF [ECF No. 160] similarly consists of long, argumentative, multi-sentence paragraphs followed by large blocks of unattributed record citations – a format that forces the Court to parse voluminous deposition testimony and exhibits and determine on its own which citations are meant to correlate to which asserted facts. This exercise wholly frustrates the purpose of Local Rule 56.1, which is "to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012).

For example, PASOF at ¶ 2 states as follows: "The AFD is a close-knit organization. Firefighters working 24-hour shifts have intimate knowledge of professional and private dealings and events in each other's lives, as those on shift

eat, sleep, and get dressed in close quarters with their shift-mates. Many AFD members socialized outside of work, where often they would discuss the AFD and their fellow firefights. The AFD, like most fire departments, was a brotherhood that relied on trust, as their lives depended on it in firefighting and dealing with emergencies." These facts are taken from four sources, according to Plaintiff. [ECF No. 160] at ¶ 2 (citing Tab 2 at 9:18-22; Declaration of Mario Maenza, Tab 3. at ¶ 5; May 26, 2021 Deposition of Darryl Howe, Tab 8 at 35:6-11, 36:8-13; Hyland Dep. at 53:18-22, 222:8-11). In order to assess the veracity of the compound facts asserted above, the Court would have to parse through each of the three purported sources to discover which facts are attributable to whom and to which cited source. Nor is this an isolated occurrence. *See also* PASOF [ECF No. 160] at ¶ 31 (containing five lines of citations to supporting authority comprised of six different exhibits); *Id.* at ¶ 36 (seven separate fact statements combined in one paragraph ostensibly supported by multiple, unattributed record cites); *Id.* at ¶¶ 1, 2, 3, 4, 7, 9, 10, 12, 18, 20, 22, 23, 24, 26, 27, 35.

"For litigants appearing in the Northern District of Illinois, the Local Rules are clear and unequivocal — compliance with Local Rule 56.1 is a critical, and mandatory, component of summary judgment motion practice." *Abdel-Ghaffar v. Illinois Tool Works, Inc.,* 2015 WL 5025461, at *6 (N.D. Ill. 2015), as amended (Sept. 30, 2015), aff'd, 706 F. App'x 871 (7th Cir. 2017). Courts expect strict compliance with Local Rule 56.1 and have ample discretion to strike improper submissions. *Cichon v. Exelon*

*Generation Co., LLC.*, 401 F.3d 803, 809-810 (7th Cir. 2005) (collecting cases). As this

Court said in *Abdel-Ghaffar* in language equally applicable here:

> It is not the role of the court to parse the parties' statements of facts and
> exhibits to construct the undisputed facts. Judges are not "like pigs,
> hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d
> 955, 956 (7th Cir. 1991). "Nor are they archaeologists searching for
> treasure." *Jeralds ex rel. Jeralds v. Astrue,* 754 F.Supp.2d 984, 985 (N.D.
> Ill. 2010) (citing *DeSilva v. DiLeonardi,* 181 F.3d 865, 867 (7th Cir.
> 1999)). It simply is not the court's job to sift through the record to
> determine whether there is sufficient evidence to support a party's
> claim. *See Davis v. Carter,* 452 F.3d 686, 692 (7th Cir. 2006). Rather, it
> is "[a]n advocate's job ... to make it easy for the court to rule in his client's
> favor...." *Dal Pozzo v. Basic Machinery Co., Inc.,* 463 F.3d 609, 613 (7th
> Cir. 2006); *see also Hamm v. Nestle USA, Inc.,* 2013 WL 4401328, at *2
> (N.D. Ill. 2013).

*Abdel-Ghaffar,* 2015 WL 5025461, at *7.

  While the Court could, consistent with the authorities cited above, strike

Plaintiff's Response [ECF No. 148] and PASOF [ECF No. 160] because of the serious

deficiencies and violations of Local Rule 56.1 described above, the Court will not do

so *en masse*. Instead, the Court will accept those of Plaintiff's proffered factual

statements that comply with Local Rule 56.1 and ignore those that do not. The extent

to which the Court has accepted or rejected Plaintiff's proffered facts will be clear in

the Court's recitation of the relevant material facts below and its application of the

law to those facts.

  The second preliminary matter involves Defendants' request that the Court

strike Dr. Steven Farmilant's Declaration and Report from the summary judgment

record pursuant to Federal Rule of Civil Procedure 37(c)(1) because he was not

properly disclosed as a fact or liability witness. *See* Exhibit 1 to Plaintiff's Statement

of Additional Facts Requiring Denial of Defendants' Motion for Summary Judgment
[ECF No. 149-2]. Defendants' request comes in their Reply in Support of Motion for
Summary Judgment [ECF No. 155]. Plaintiff responded to Defendants' request in his
own filing [ECF No. 158] and the Court construes Defendants' request as a motion to
strike that is fully briefed and ripe for decision. Defendants are correct that Dr.
Farmilant was not disclosed by Plaintiff as a fact or liability witness pursuant to Rule
26(a)(1) during fact discovery in this case. Plaintiff, however, says that Dr. Farmilant
was disclosed as an expert, not a fact, witness.

Defendants' request that the Court not consider Dr. Farmilant's Declaration
or Report is well-taken at this stage. On December 31, 2021, Ross was evaluated by
Dr. Farmilant, Psy.D., and diagnosed with Complex Post Traumatic Stress Disorder.
Ross included in his original Local Rule 56.1 statement Dr. Farmilant's Declaration
and complete expert report, in which Dr. Farmilant offered several opinions on the
cause of Ross's diagnosis, descriptions of Ross's symptoms and long-term prognosis,
and a handwriting analysis of two letters purportedly written by Kara in May 2017.
*Id.*; [ECF No. 149-2]. Ross reaffirmed his reliance on Dr. Farmilant in his Amended
Statement of Facts. *See* PASOF [ECF No. 160] at ¶ 40.

Putting aside questions about the admissibility of Dr. Farmilant's opinions
under *Daubert v. Merrell Dow Pharmaceuticals Inc.,* 509 U.S. 579 (1993), and
whether he is being offered as a fact or expert witness, or both, Ross's counsel
expressly disavowed that Dr. Farmilant would have any role in the liability portion
of this case and proffered that he would be used exclusively as a damages expert when

the Court discussed with counsel whether Defendants' motion for summary judgment could be briefed before expert discovery was completed during a hearing on September 21, 2021. Transcript [ECF No. 155-1] at 44–45 ("THE COURT: …And right now, plaintiff's expert disclosures are due on the 25th and are your experts -- of October. Is your expert going to be a damages expert or a -- MR. CARUSO: A damages expert, yes. Well, a medical expert. THE COURT: Right, right. MR. CARUSO: As to the severity of his emotional distress. THE COURT: Right. Okay. But it's not a, you know, an expert on procedures in firehouses or anything like that. MR. CARUSO: Correct.").

The purpose for which Ross now offers Dr. Farmilant's opinion stands in stark contrast to his counsel's representations that Ross's medical damages expert would only opine as to the "severity of [Ross's] emotional distress." *Id.* The Court relied on that representation when it agreed to Ross's counsel's proposal that expert discovery and briefing of Defendants' motion for summary judgment could proceed concurrently. [ECF No. 155-1] at 51 ("THE COURT: …Mr. Caruso, any big objections to briefing [summary judgment] along with experts? MR. CARUSO: No, that was my proposal. Yes, I agree with that."). The Court set an expert discovery schedule that called for Plaintiff to make his Rule 26(a)(2) expert disclosures *after* Defendants filed their motion for summary judgment. [ECF Nos. 134, 136, 138, 141, 142]. Consistent with that schedule, Plaintiff served his Rule 26(a)(2) disclosures more than a month after Defendants filed their motion for summary judgment. [ECF No. 152]. But Dr. Farmilant's opinions on causation and other matters exceed the scope of counsel's

prior representations that he would be offered exclusively as a damage witness and are tailored to the ultimate question of whether Argonne is liable for a hostile work environment that injured Ross. *See, e.g.,* PASOF at ¶ 40 ("4) The conduct of Mr. Kara, Chief Hyland and the administration at Argonne caused anxiety severe enough to require that Mr. Ross seek medical, psychological and psychiatric help; and 5) Mr. Ross had no choice but to resign from a job he loved due to this suffering and consequent decline in his well-being. 6) The administrators at Argonne Labs who oversaw the fire department have also contributed to Mr. Ross's illness by its negligence and apparent indifference to the obviously racially motivated discrimination and abuse of Mr. Ross."). Dr. Farmilant also opines as to whether Kara wrote two letters attributed to him dated in May 2017. *Id.*

The Court agrees that Plaintiff cannot use Dr. Farmilant's Declaration and Report to oppose Defendants' motion for summary judgment given his counsel's prior representations as to the type of opinion Dr. Farmilant would be rendering and the purpose for which it would be used. Under these circumstances, the Court will not consider Dr. Farmilant's Declaration or Report in the context of Defendants' motion for summary judgment as to liability. Said another way, Plaintiff is estopped to rely on Dr. Farmilant to oppose Defendants' motion for summary judgment given his counsel's prior representations that Dr. Farmilant would not be opining on matters relating to liability. The Court leaves for another time whether Dr. Farmilant can testify to the facts or opinions contained in his Declaration or Report. Accordingly, Defendants' Motion to Strike Farmilant's Declaration and Report from the summary

judgment record, which is contained in their Reply [ECF No. 155] in support of their motion for summary judgment, is denied without prejudice.

## III.

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are now before the Court. Ross joined the Argonne Fire Department in 1997 and was its sole African American member at all times relevant. DSOF ¶ 1; PASOF ¶ 1. Kara, Ross's main antagonist in this case, had a history with Ross going back decades. PASOF ¶¶ 8, 9. In 2001, long before the events from which this case arises occurred, Ross and Kara worked together at the Richton Park Fire Department, where Ross alleges Kara used racially charged language to refer to Ross and other African American firefighters. *Id.* In 2007, Ross was promoted to lieutenant at Argonne. DSOF ¶ 21; PASOF ¶ 9. At that time, Kara and Ross both worked at Argonne, and Kara told Ross that he was only promoted "because he was black" and remarked "let the games begin." DSOF ¶ 21; PASOF ¶ 9.

Beginning at least in 2013, and according to Ross well-before then, Kara repeatedly called Ross a "Black Mother F***er" and gave him the middle finger when they were in the firehouse together. DSOF ¶¶ 15, 22; PASOF ¶ 9; Ross Deposition [ECF No. 145] at 49:20 – 52:19.[3] In January or early February of 2013, Kara hung a

---

[3] Ross alleges in his Second Amended Complaint [ECF No. 86] (at ¶ 29) that Kara began making these comments in 2013. However, Ross testified at his deposition that Kara previously engaged in this type of verbal harassment when, for example, both Kara and Ross worked at the Richton Park Fire Department. Ross Deposition [ECF No. 145] at 50:12–55:3; 52:14–52:19 ("Multiple times calling me a black MFer."). Kara also referred to Ross as a "Canadian" to another firefighter, Mario Maenza ("Maenza"), at least three times during Maenza's tenure at Argonne (from about 2010 until 2018). PASOF ¶ 9; [ECF No. 149-4]. Ross did not hear Kara refer to him as a Canadian, but both Maenza and Ross characterize the

black-faced doll, essentially a puppet on strings in his own open locker, which was next to Ross's. DSOF at ¶ 15; PASOF at ¶ 3.[4] Kara was suspended because of the puppet incident and was required to complete workplace conduct training. DSOF ¶ 18. Argonne also enacted a written policy disallowing Kara from swapping shifts with any other firefighter without approval from the fire chief. [ECF No. 149-8]; Howe Deposition [ECF No. 149-9] at 103:10–14. The intent behind this discipline was "to say that swaps with [Kara] could take place in the future, [but] that it must have the authorization from the fire chief for such a swap." Howe Deposition [ECF No. 149-9] at 106:6–9. However, the fire chief at the time, Chief Patterson, verbally promised Ross that he would never approve a request by Kara to work on Ross's shifts. *Id.* Kara was indeed not permitted to swap onto any of Ross's shifts during the rest of Chief Patterson's tenure. *Id.*

Chief Patterson's verbal promise to prevent Kara from swapping or trading onto Ross's shifts did not apply to overtime work, although Ross complained to Chief Patterson that he did not want Kara working on his shift at all. Ross Deposition [ECF No. 145] at 33:19–35:12 ("I did not want Kara working on my shift was my

---

term "Canadian" as a derogatory code word for African Americans used by Kara. *Id.* During that same time, Maenza also saw Kara, outside of Ross's presence, make hand gestures referring to Ross's skin color up to eight times. *Id.*

[4] The Court relied on Plaintiff's Second Amended Complaint when it previously (and erroneously) described that the black faced puppet was placed in Ross's locker. *Ross,* 2020 WL 2041338, at *4; [ECF No. 86] at ¶ 30 ("In 2013, Kara hung a black-faced puppet in Ross' locker in the Argonne firehouse…The fact that the racist puppet was hung inside Ross' locker reminded him of the Klu Klux Klan planting burning crosses on the lawns of African Americans, both actions meant to show that even personal property is not safe."). Both parties in their Rule 56.1 statements now crystallize for the Court that the puppet was not hung in Ross's locker but in Kara's own locker, which was next to Ross's locker. DSOF at ¶ 15; PASOF at ¶ 3.

complaint."). Kara was allowed to work overtime on Ross's shifts between 2013 and 2016, and in fact did so on an unknown number of occasions. Shift swaps generally were approved ahead of time, but firefighters often worked overtime to satisfy the operational needs of the fire station and account for unanticipated absences. Overtime work also was subject to collective bargaining rules in a way that shift changes were not. DSOF at ¶¶ 10, 11; Plaintiff's Response at ¶¶ 10, 11.[5]

In April of 2016, Chief Patterson retired and was replaced by Chief Hyland. DSOF ¶ 7. Chief Hyland testified that he would have fired Kara because of the seriousness of the puppet incident had he been fire chief at the time. PASOF ¶ 4; Hyland Deposition [ECF 145] at 41:17-42:10. But Chief Hyland did not consider himself to be bound by Chief Patterson's verbal promise not to allow Kara to trade onto Ross's shifts. Hyland Deposition [ECF No. 145] at 38:6–10. In 2017, citing cost effectiveness, understaffing, and complaints from other firefighters and the firefighter's union, Chief Hyland began allowing Kara to trade onto Ross's shifts. DSOF ¶ 30; PASOF ¶¶ 28, 29. Other firefighters complained it was inconvenient that they were unable to freely swap shifts with Kara, and Kara himself also complained of the same restriction and threatened to file a union grievance over the issue. Pemble Deposition [ECF No. 145] at 42:10–43:7; Defendants' Response ¶ 29. Chief Hyland

---

[5] Ross was not comfortable with Kara working overtime on his shifts, and he told both Chief Patterson and his successor, Chief Hyland, that he was not comfortable in light of Kara's continued harassment. Ross understood overtime work to be a matter of operational necessity, meaning that a certain number of people needed to be present each shift and that would sometimes involve Kara staying over later at the firehouse, or coming early. Ross Deposition [ECF No. 145] at 33:19–35:12. That, however, did not make it any more palatable to Ross that he was required to work on shifts with Kara when Kara worked overtime on Ross's shift.

was concerned that grievance might be successful. *Id.* Kara also worked overtime on Ross's shifts during that time. DSOF at ¶¶ 10–11, 14. Chief Hyland knew that Ross felt uncomfortable not only with Kara trading onto Ross's shifts, but also with Kara working overtime on his shifts because Ross viewed Kara as racist. Hyland Deposition [ECF No. 145] at 87:20–89:8, 162:3–19. But Chief Hyland felt there was nothing he could do about overtime work given union rules and the operational needs of the firehouse. *Id.*

In early 2017, a scheduling conflict arose on Ross's battalion involving fire fighter Liz Stennett ("Stennett"). Stennett was scheduled to work on April 1, 2017, but her daughter's sweet sixteen birthday party also was that day. Hyland Deposition [ECF No. 145] at 124:9–11. Stennett sought to give away her April 1, 2017 shift to another firefighter, and submitted a request to the online system to that effect. *Id.* at 131:3–133:17. Kara accepted the request. *Id.* at 134:9–13. Ross, however, denied the trade, as did Chief Hyland at first. *Id.* at 134:17–135:14; DSOF ¶ 31; PASOF ¶ 31. Stennett later came to Chief Hyland very upset and explained that she had tried to get someone else to swap her shift, but Kara was the only person who was available. Hyland Deposition [ECF No. 145] at 135:6–14. Without the swap, Stennett explained, she would either need to falsely call in sick, or miss her daughter's birthday. *Id.* Chief Hyland reviewed the schedule and noted that due to understaffing and the nature of the shift schedule, there were only four firefighters, of which Kara was one, with whom Stennett could swap shifts in order to attend her daughter's birthday. DSOF ¶ 31; Hyland Deposition [ECF No. 145] at 126:1–127:22, 130:6–24.

On March 29, 2017, Stennett resubmitted her April 1, 2017 swap request to the online portal, and Kara accepted immediately. Hyland Deposition [ECF No. 145] at 132:20–134:20. Ross denied the trade that same day, and wrote to Chief Hyland, Kim Mandekich, and Darryl Howe that "Kara has and will make my work a hostile working environment. Kara has already started by accusing me of not ordering him the Maltese crosses for his Class A uniform. I would like to see this behavior stopped. Now Kara knows the incident he did in the past is off his record, it is time to start again." Ross Deposition [ECF No. 145] at 63:7–64:2, 65:10–17, 73:8–74:4. Kara and the firefighter's union complained to Chief Hyland that the April 1, 2017 Stennett-Kara swap was denied, and Chief Hyland eventually approved it out of "operational necessity." Ross Deposition [ECF No. 145] at 73:5–15; Hyland Deposition [ECF No. 145] at 127:23–128:7, 135:2–139:5. Chief Hyland did not ask the other three firefighters who were available to work that day if they would go out of their way to accommodate Stennett. PASOF ¶ 31; Hyland Deposition [ECF No. 145] at 137:9–12.

Kara ultimately traded onto Ross's shift at least three times in 2017: on April 1, May 2, and August 10. Ross did not work the first two shifts with Kara, instead calling in sick to avoid the fear, anxiety, and depression caused by working with Kara. DSOF ¶ 25; PASOF ¶¶ 22, 23. Ross says Kara swapped onto his shift up to eight times between March 2017 and Kara's retirement in 2018. PASOF ¶ 22. On at least four other occasions between 2017 and 2018, but potentially as many as ten times, Ross says Kara worked overtime on Ross's shift, meaning he either stayed late from a previous shift to cover an unexpected absence by another firefighter or came in early

14

to ensure enough firefighters were present to cover a shift. *Id.*; Ross Deposition [ECF No. 145] at 33:19–35:12.[6]

Ross believed Chief Hyland's decision to allow Kara to trade onto Ross's shifts was motivated by racial animus. DSOF ¶¶ 30, 32; PASOF ¶ 34. In addition to backtracking Chief Patterson's verbal promise not to allow Kara to trade onto Ross's shifts, Chief Hyland also engaged in what Ross characterizes as a racially motivated campaign to undermine Ross in his role as a Battalion Chief. On a date uncertain, Maenza overheard Chief Hyland tell another firefighter, who he believed to be Lieutenant Nugent, to select Kara to work overtime on Ross's shift. PASOF ¶ 34. During this conversation, Maenza heard Hyland comment, "that Black son of a bitch is not running the fire Department." *Id.* In addition, according to Ross, Chief Hyland assigned tasks to lower-ranking firefighters in a way that Ross perceived as disrespectful to his role as Battalion Chief. DSOF ¶¶ 39, 41; PASOF ¶ 36. Chief Hyland took away Ross's responsibility for personnel uniforms and lockers, called meetings with other battalions without including Ross, gave Ross what he characterized as an insulting performance appraisal, and recommended that Ross purchase a grammar book to improve errors in his written correspondence. *Id.*

---

[6] Although Ross at one time asserted Kara traded onto his shift four times (April 1, 2017, May 2, 2017, August 10, 2017, and September 18, 2017), Ross later agreed that Kara worked overtime on his shift on September 18, 2017 and did not trade onto it. [ECF No. 148] at 7–8. The record is not clear, at least in the Court's view, with respect to how many times Kara either swapped onto Ross's shifts or worked overtime on one of Ross's shifts in 2017 and 2018, and the parties dispute whether Kara worked more overtime on Ross's shifts after Hyland became Fire Chief in 2016. PASOF ¶ 24; Defendants' Response ¶ 24.

15

Ross identified the following examples of how Kara continuously harassed him from at least 2017 until Kara's retirement in 2018: Kara repeatedly called Ross a "Black Mother F***er, he gave Ross the middle finger when people were not looking, stared at him in a hostile manner, tried to start a fight with him when people were not looking, attempted to bump into Ross multiple times and elbowed him on one occasion, and said words under his breath when people were not listening. DSOF ¶¶ 23, 27; Ross Deposition [ECF No. 145] at 29:17–30:20, 137:20–23. Ross described this harassment as "common knowledge" at the fire station, although some of it occurred behind his back. PASOF ¶¶ 14, 23. In Ross's view, Kara's behavior was a continuing attempt to undermine his authority as Battalion Chief and the effectiveness of the battalion. Hyland Deposition [ECF No. 145] at 176:16–23. Ross could not say definitively whether he reported all this behavior to Chief Patterson, but he knows he verbally told Chief Hyland about it. Ross Deposition [ECF No. 145] at 55:4–56:24. Kara also filed what Ross characterized as a baseless complaint against him in early 2017 for not timely ordering a Maltese cross for Kara's uniform. DSOF ¶ 26; PASOF ¶ 27. The parties' dispute the circumstances surrounding the Maltese cross episode. PASOF ¶¶ 19, 26, 27; Defendants' Response ¶¶ 19, 26, 27.

As a result of the conduct he endured at Argonne, Ross suffered severe emotional distress, including sleeplessness, hypertension, and anxiety. PASOF ¶¶ 23, 38, 39. Kara retired from Argonne in April 2018, DSOF ¶ 29, and Chief Hyland followed suit in November of 2020. DSOF ¶¶ 3; PASOF ¶¶ 36. Ross resigned from

16

Argonne in March of 2021 to become the full-time fire chief at Calumet Park Fire Department. DSOF ¶ 8; PASOF ¶ 39; Ross Deposition [ECF No. 145] at 14:22–15:5.

## IV.

## ANALYSIS

Under Title VII, an employer may not discriminate based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). Section 1981 protects the right of all persons to make and enforce contracts regardless of race, and courts generally apply the same framework in evaluating race-based hostile work environment claims under both statutes. *Egonmwan v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 845, 850 n. 7 (7th Cir. 2010) ("The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983.") (citing *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007); *Davis v. Wis. Dep't of Corrections,* 445 F.3d 971, 976 (7th Cir. 2006)).

To state a claim for a hostile work environment based on race under Title VII or Section 1981, therefore, Ross must prove that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Johnson,* 892 F.3d at 900. The Seventh Circuit has sometimes replaced "the first prong—that the employee was subject to unwelcome harassment—with the requirement that the work environment was 'both subjectively and objectively offensive.'" *Cole v. Bd. of Trustees of N. Illinois Univ.,* 838 F.3d 888, 896 n.6 (7th Cir. 2016) (citing *Yancick v.*

17

*Hanna Steel Corp.,* 653 F.3d 532, 544 (7th Cir. 2011)). But more recently, the question has focused on whether the harassment was severe or pervasive enough to rise to the level of a hostile work environment. *Id.; see also, Johnson,* 892 F.3d at 900. In the end, the Seventh Circuit has concluded "the inquiry is the same." *Id.*

The question of severity or pervasiveness turns on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 840 (7th Cir. 2009); *see also Milligan-Grimstad v. Stanley,* 877 F.3d 705, 714 (7th Cir. 2017). A workplace "need not be hellish to constitute a hostile work environment." *Jackson v. County of Racine,* 474 F.3d 493, 500 (7th Cir. 2007); *see also Gates v. Bd. of Educ. of the City of Chicago,* 916 F.3d 631 (7th Cir. 2019). As the Seventh Circuit has noted, "[i]t is important to recall that harassing conduct does not need to be both severe and pervasive." *Jackson,* 474 F.3d at 499. A single incident, if severe enough, may suffice to establish a hostile work environment. *Id.*; *see also, Smith v. Sheahan,* 189 F.3d 529, 533 (7th Cir. 1999). "Conversely, conduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson*, 474 F.3d at 499.

### A.    Unwelcome Harassment Based on Race

Ross is a member of a protected class and has established that he was subject to unwelcome harassment at Argonne because of his membership in that protected

class. *Johnson*, 892 F.3d at 900. The crux of this case is whether that harassment is actionable; that is, whether it was so severe or pervasive as to alter the conditions of Ross's employment and create a hostile working environment at Argonne, and then whether there is a basis for employer liability. *Id.*

### B.   Severe and Pervasive Conduct

#### i.   Continuing Violation Theory and the *Morgan* Factors

Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge with the Equal Employment Opportunity Commission ("EEOC"). Generally, the Court may only consider evidence from the 300–day period. *Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344 (7th Cir. 1999). However, if there are allegations of continuing violations, the Court may look outside of the relevant time period. *Id.*; *Dandy v. United Parcel Serv., Inc.,* 388 F.3d 263, 270 (7th Cir. 2004). The continuing violation doctrine "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," but permits "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period…so long as an act contributing to that hostile environment takes place within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).

A central issue in this case is whether the 2013 puppet incident is part of one, continuous hostile work environment that existed from the date of that incident in or about February 2013 through the filing of Ross's EEOC charge in April 2017. At the motion to dismiss stage, the Court concluded "that the 2013 puppet incident, as well

as Kara's racially offensive verbal attacks in 2013 and Argonne's response to that conduct, may be relevant to Ross's hostile work environment claim under a continuing violation theory." *Id.* In other words, at the pleading stage, this Court was unwilling to say there were no circumstances under which Ross could avail himself of the continuing violation theory as a matter of law given his broad-sweeping allegations of continued harassment from 2013 through 2018. The Court cautioned, however, that under a less forgiving standard of review – perhaps after fact discovery and deposition testimony had more fully fleshed out the nature and scope of Ross's claims – the undisputed material facts may not support a continuing violation theory "given the intervening time period, change in direct leadership at Argonne, and prior disciplinary action taken against Kara." *Ross*, 2020 WL 2041338, at *7.

After the benefit of full discovery, Ross has not established that the 2013 puppet incident is sufficiently connected to the alleged harassment Ross experienced in 2017 and 2018 such that it can be considered part of one, continuous hostile work environment consistent with Supreme Court precedent and Seventh Circuit law. The factors outlined in *Nat'l R.R. Passenger Corp. v. Morgan* and its progeny – whether there is a gap in time between incidents, change in leadership or management, or prompt and appropriate corrective action by the employer – inform the Court's analysis of whether a continuing violation exists under the facts now borne out on summary judgment. *Morgan*, 536 U.S. 101; *see also, Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 726–27 (7th Cir. 2004). Ross largely declines to engage with the *Morgan* factors, limiting his response to Defendants' arguments to just one short paragraph.

20

[ECF No. 147] at 15. A more fulsome discussion of the *Morgan* factors is required, and the Court now turns to those considerations.

The first and "simplest factor is time: [a] significant gap between alleged incidents of discriminatory harassment can sever the hostile work environment claim." *Ford v. Marion Cnty. Sheriff's Off.,* 942 F.3d 839, 852 (7th Cir. 2019) (citing *Milligan-Grimstad,* 877 F.3d at 713; *Lucas,* 367 F.3d at 727). The inquiry is fact specific, and "[t]here is no magic number; the question is whether 'the series of allegations describe continuous conduct rather than isolated incidents.'" *Id.*; (citing *Milligan-Grimstad*, 877 F.3d at 713). But the Seventh Circuit has concluded that a three-year gap "stretched the continuing violation theory beyond any workable limit," *Lucas*, 367 F.3d at 727, and has indicated that a gap "as large as two or three years…cannot connect otherwise distant allegations into a single employment practice," *Milligan-Grimstad,* 877 F.3d at 713, and a "two-year gap between allegedly discriminatory acts could not support a continuing violation claim." *Tinner v. United Ins. Co. of Am.,* 308 F.3d 697, 708–09 (7th Cir. 2002) (citing *Selan*, 969 F.2d at 567).

The 2013 puppet incident, though egregious, occurred four years before Ross filed his EEOC charge in 2017. Although Ross says generally that Kara "repeatedly harassed" him beginning in or before 2013 and continuing through 2017, it is not clear from the record how often this conduct occurred during that time. Kara sometimes worked overtime on Ross's shifts between 2013 and 2017, and there were times when they were present in the firehouse together, but Ross's testimony and the evidence in the summary judgment record concerning the extent and nature of Ross's

interaction in the firehouse with Kara between 2013 and 2017 is extremely limited even after full discovery. *See, e.g.,* Ross Deposition [ECF No. 145] at 28:18–29:2 ("Q: …I want to make sure we're focusing on the time frame here, Mr. Ross, of between February of 2013 to March of 2017. So do you recall, you said you -- a moment ago, you complained to Chief Patterson about things that Kara was doing. What were the things that Kara was doing that made you complain to Chief Patterson? A: I cannot remember everything he was doing, but it was little things to aggravate me, to irritate me, to probably -- I cannot remember exactly what it was."); 50:10–17 ("Q: …It says this was in 2013 that he began making racial comments. Was this prior to or after the incident with the puppet in the locker room? A: I think it was both. I cannot remember, but I think it was both because he would -- he was making those comments at Richton Park with other African Americans also."); 51:13–18 ("Q: …Did he make any other racial comments to you other than black MFers? [objection noted] A: I cannot recall because he made a lot of comments when he saw me. Q: Okay. As we sit here today, there is no other particular comments that Mr. Kara made to you that you can recall? A: He was giving me the finger, the middle finger, other little comments under his breath. I cannot recall exactly when."); 137:24–138:11 (Q: Okay. Other than -- so is there anything else, Mr. Ross, that Firefighter Kara did that is not contained here in this interrogatory answer that we have not talked about today that he did that you believe constitutes racial harassment? A: There was a lot of things that he did. He harassed me from time before the puppet and after the puppet, all the way until he retired. A while.") (objection omitted).

Summary judgment demands more specificity than Ross provides here. *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989) ("[b]are allegations not supported by specific facts are insufficient in opposing a motion for summary judgment."); *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003) ("Conclusory allegations, unsupported by specific facts, will not suffice."). Because the discovery in this case largely focused on 2017 and 2018, the factual record is light on the specifics of what happened between 2013, when Chief Patterson prevented Kara from trading onto Ross's shifts, and 2017, when Chief Hyland began allowing Kara to trade onto Ross's shifts.

The second relatedness factor courts consider is whether a change in leadership or management occurred between purportedly connected events. A change in managers can affect whether incidents are related because the "actions of supervisors impart vicarious liability to the employer for discriminatory harassment." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765 (1998); *see also, Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 386 (7th Cir. 2007); *Bright v. Hill's Pet Nutrition, Inc.,* 510 F.3d 766, 769–70 (7th Cir. 2007). The change in leadership at Argonne – or, as Maenza heard Chief Hyland say when he took over as fire chief, that a "new sheriff" came to town in 2016 – cuts against Ross's claim that he suffered one, continuous hostile work environment from 2013 (or earlier) until he leveled his EEOC charge in 2017. Ross himself testified that Chief Patterson did not harass or discriminate against him based on his race during his tenure at Argonne which included the period between 2013 and 2016. Ross Deposition [ECF No. 145] at 74 ("Q:

Do you think that Chief Patterson harassed you on the basis of your race when he was the fire chief at Argonne? A: I know he did not. Q: You know he did not, right? A: Correct. Q: Is that what you said? Okay. Do you think Chief Patterson discriminated against you at all when he was fire chief at Argonne? A: No."). It was only after Chief Hyland took over from Chief Patterson that Ross charges that Kara was once again allowed to trade onto Ross's shifts.

The Seventh Circuit has explained that "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring" defeats employer liability for co-worker harassment. *Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 636 (7th Cir. 2009). Argonne acted promptly when it suspended Kara for the puppet incident in 2013 and required that Kara complete corrective training. It also enacted formal, written discipline requiring approval by the fire chief before Kara could swap shifts with any firefighter. Because of that policy, and Chief Patterson's verbal promise not to approve any request by Kara to swap onto Ross's shift during his tenure, Kara was not allowed to swap onto Ross's shift for four years. Chief Patterson markedly reduced the opportunities for Kara to harass Ross after the puppet incident.

That Ross affirmatively disclaimed the puppet incident as the basis for his EEOC charge also weighs against applying the continuing violation theory to the facts of this case. A plaintiff may only bring claims that were included in the original EEOC charge. *Sitar v. Indiana Dept. of Transp.,* 344 F.3d 720, 726 (7th Cir. 2003). Here, Ross expressly limited his EEOC complaint to events that began four years after the puppet incident, when Kara was allowed by Chief Hyland to resume trading

onto Ross's shifts. *See* 2017 EEOC Complaint [ECF No. 145] at 28 ("Beginning in early 2013, I was the victim of clearly race discrimination acts by a fire fighter, Richard Kara (Kara) on my shift, including the hanging of a black-faced puppet on my locker (picture attached). The Respondent suspended Kara for engaging in discriminatory actions. *That is not the action I am complaining of in this charge. Subsequent to that time and continuing through the present*, I believe that I have been harassed, and discriminated against, by that employee upon his return to work, which actions have been condoned by Respondent…") (emphasis added).

The rationale for only allowing plaintiffs to litigate claims that were first presented to the EEOC is two-fold: first, it gives the EEOC the opportunity to settle the precise dispute between the employee and employer, and second, it puts the employer on notice of the charges against it. *Vela v. Village of Sauk Village*, 218 F.3d 661, 664 (7th Cir. 2000). The letter and intent of the above-described rule would be frustrated if Ross were now permitted to reach back four years in time and bring allegations into this case as part of a continuing violation theory that he specifically abnegated in his EEOC charge.

The intervening disciplinary and preventive action by Argonne, the length of time between the puppet incident in 2013 and the conduct that occurred in 2017, the absence of clear evidence in the record about Kara's actions between 2013 and 2017, and the change in supervisors from Chief Patterson to Chief Hyland in 2016 all prevent the puppet incident from being considered as part of the hostile work environment Ross alleges he suffered in 2017 and 2018. The temporal scope of Ross's

actionable hostile work environment claim must therefore be restricted to harassing conduct that occurred in and after 2017.

That does not mean, however, that the 2013 puppet incident and Kara's past conduct towards Ross have no role in this case. That conduct may be time barred from a liability standpoint, but *Morgan* instructs that even untimely "prior acts" still can be considered as "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. In this case, Kara's past race-based conduct potentially may be used to support Ross's claims that certain of Kara's actions within the relevant period, although lacking in overt racial character, were imbued with discriminatory animus or racial intent. *See, e.g., Malin v. Hospira, Inc.,* 762 F.3d 552 (7th Cir. 2014); *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 792 (7th Cir. 2007); *Seung-Whan Choi v. Bd. of Trustees of Univ. of Illinois*, 2017 WL 3278823, at *7 (N.D. Ill. 2017); *Tanner v. Simelton*, 2015 WL 1983045, at *3 (N.D. Ill. 2015).

### ii.    Timely Claims

Turning to the conduct alleged to have occurred during the relevant period, the Court considers the totality of the circumstances in assessing whether that conduct is sufficiently severe or pervasive to support a hostile work environment claim. *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 868 (7th Cir. 2013). As discussed earlier, the question of severity or pervasiveness turns on "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs,* 587 F.3d at 840. Here, a reasonable jury

26

could find that the alleged discriminatory conduct in this case was severe or pervasive. That is true particularly if a jury can consider the 2013 puppet incident as a prior act that may be used as background evidence to support an inference of discriminatory intent consistent with *Morgan* and the Federal Rules of Evidence. *Morgan*, 536 U.S. at 113 ("Nor does the statute bar an employee from using prior acts as background evidence in support of a timely claim.").

Viewing the record in the light most favorable to Ross, as the Court must at this stage, Ross was subjected to the following behavior during the relevant time. Kara traded onto Ross's shift at least three and perhaps as many as eight times and worked overtime on Ross's shift as many as ten times between 2017 and 2018. During the approximate dozen or more times Kara worked on Ross's shifts in some capacity in 2017 and 2018, and when they were in the firehouse together generally, Kara would give Ross the middle finger, try to provoke Ross into fights, mutter insults to Ross under his breath, try to bump into Ross or elbow Ross and lure him into a physical confrontation, stare at Ross in a hostile manner, and purposefully undermine Ross in his role as Battalion Chief. He made physical contact with Ross on at least one occasion and referred to Ross as a "Canadian" behind Ross's back, a term both Maenza and Ross characterize as a derogatory code word for African Americans. Kara repeatedly called Ross a "Black Mother F***er," an overt racial epithet, to his face and made derogatory hand gestures to other firefighters outside of Ross's presence focusing on Ross's skin color. Kara also filed what Ross

27

characterizes as a baseless, racially motivated complaint against Ross in early 2017 because he said Ross did not timely order a Maltese cross for Kara's uniform.

Chief Hyland, who was aware of the 2013 puppet incident and in fact testified he would have fired Kara for it had he been fire chief at the time, engaged in the following conduct in and after 2017: he allowed Kara to trade onto Ross's shifts at least three and perhaps as many as eight times, which put Ross and his primary antagonist in close proximity to each other in the firehouse including overnight, even though Chief Hyland admits he was aware of at least one incident in which Kara called Ross a "Black Mother F***er" and another incident in which Kara tried to nudge or elbow Ross when Kara walked by him. Hyland Deposition [ECF No. 145] at 29:14–30:7, 46:6–47:4. Chief Hyland also was overheard telling a lieutenant (though outside of Ross's presence) "that Black son of a bitch is not running the fire Department," and he assigned tasks to lower-ranking firefighters in a way that Ross perceived as disrespectful to his role as Battalion Chief. He also took away Ross's responsibility for personnel uniforms and lockers and called meetings with other battalion chiefs without including Ross.

Defendants reduce the facts noted above to isolated incidents occurring over a relatively long period of time and argue that none of them rise to the level of actionable severe or pervasive conduct. But "courts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive." *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (quoting *Hall v. City of Chicago*, 713 F.3d 325, 331

28

(7th Cir. 2013)); *see also, Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000) ("under the Supreme Court's totality of circumstances approach, all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive."); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Here, several of the above-described comments and incidents raise a jury question as to whether Ross experienced a severe or pervasive racially discriminatory working environment. At least two of the alleged remarks clearly are racially-charged – Kara's repeated use of the words "Black Mother Fu***er" in confrontations with Ross, and Hyland's statement to a lieutenant that "that Black son of a bitch is not running the fire Department." Unambiguously racial epithets fall on the "more severe end of the spectrum" of hostile work environment claims. *Nichols,* 755 F.3d at 601 (quoting *Cerros v. Steel Technologies, Inc.,* 398 F.3d 944, 950 (7th Cir. 2005)); *see also, Passananti v. Cook County,* 689 F.3d 655, 668 (7th Cir. 2012) ("racially-charged words certainly can suffice" to raise a jury question as to whether a work environment was sufficiently severe or pervasive); *see also, e.g., Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912 (7th Cir. 2010) (holding that summary judgment was inappropriate as to the "severe or pervasive" prong where evidence showed that coworkers called the plaintiff "a black bitch" and the "n-word" on multiple occasions).

The overtly offensive and threatening nature of Kara's repeated verbal and physical harassment also is a significant factor in the Court's evaluation of the severity or pervasiveness of the discriminatory conduct Ross experienced at Argonne.

Kara repeatedly tried to draw Ross into a physical confrontation, start a fight when people were not looking, or bump into Ross, in one instance making actual physical contact. The severity of this physical threat conduct is amplified in the context of a firehouse where firefighters work, sleep, and eat together and must depend upon each other in potentially life-threatening situations. Viewing the 2013 puppet incident – which Ross argues evokes a particularly graphic and historically powerful image of racial discrimination and harassment – as a "prior act" that potentially can be used "as background evidence in support of a timely claim," *Morgan*, 536 U.S. at 113, Kara's alleged attempts at and in one instance actual physical contact with Ross are facts that weigh against granting summary judgment here. Plaintiff's Response [ECF No. 147] at 11–12 (citing *Cole*, 838 F.3d at 897 ("'[g]iven the status of the hangman's noose as 'a visceral symbol of the deaths of thousands of African-Americans at the hand of lynch mobs,' even a single incident of a noose being improperly displayed in the workplace can support a hostile work environment claim."); *McKinney v. Chicago Transit Authority*, 2022 WL 2257246, at *14 (N.D. Ill. 2022); *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 814 (7th Cir. 2022) ("Nevertheless, forms of harassment that might seem neutral in terms of race…can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status.") (internal citations and quotations omitted).

The fact that Kara was subordinate to Ross in the firehouse command structure is relevant but not dispositive under the circumstances of this case. First,

Ross's superior officer, Chief Hyland, is alleged to have uttered a racial epithet when referring to Ross and that weighs heavily in the Court's assessment of the totality of the circumstances in this case. *Mason v. Southern Illinois University at Carbondale*, 233 F.3d 1036, 1044–45 (7th Cir. 2000) ("If a plaintiff claims that he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach, all instances of harassment by all parties are relevant to proving that his environment is sufficiently severe or pervasive."). Second, although Kara was Ross's subordinate, Kara's actions nevertheless had significant impact on the conditions of Ross's employment due to the nature of the workplace in this case. Kara's conduct occurred in a firehouse where firefighters "ha[ve] to sleep, shower, and eat [together when on duty]. That is, it was not just a place of employment, it was also a part-time home." *Silverman v. Johnson*, 2004 WL 2044182, at *11 (N.D. Ill. 2004)*; see also Gomez v. City of Chicago,* 2017 WL 131565, at *3 (N.D. Ill. 2017). Even though Ross was Kara's superior officer within the Argonne fire department, they were required to work closely together and to depend upon each other in potentially in life and death situations. This is yet another factor a reasonable juror could find persuasive in determining that, under the totality of the circumstances, the race-based conduct Ross endured at Argonne was severe or pervasive.[7]

---

[7] According to Ross, "Every single day I came to work at the AFD [Argonne], after Hyland broke the promise Chief Patterson made to me, in late March 2017, I faced . . . the uncertainty whether Kara would escalate his racist harassment to a violence, leaving me unable to sleep restfully in the firehouse; . . . [t]he uncertainty whether Kara would cause me to have an 'accident' if the fire bell rang. . . ." Ross Declaration [ECF No. 149-12] at 3.

Defendants also ask the Court to infer the work environment at Argonne was not severe or pervasive because they say Ross did not complain about Kara being allowed to work overtime on his shifts between 2013 and 2017 and Ross retained his rank as Battalion Chief at Argonne until he resigned in 2021. As an initial matter, Defendants are wrong that the record supports the inference that Ross did not complain about Kara's overtime work on Ross's shifts. Ross testified he did complain to Chief Patterson about being forced to work with Kara when Kara worked overtime on his shifts between 2013 and 2017, even if he recognized that union and operational considerations were obstacles to Chief Patterson doing anything about that. Ross Deposition [ECF No. 145] at 34:20–35:8. Chief Hyland also recognized that Ross was uncomfortable working a shift with Kara under any circumstances. Hyland Deposition [ECF No. 145] at 88:22–89:8. In addition, an employee's ability to tolerate abusive conduct does not resolve the question of whether that conduct is severe or pervasive enough to support a hostile environment claim. *Bowens v. Sunshine Ret. Living, LLC,* 2021 WL 5304001, at *5 (N.D. Ind. 2021) ("That [Bowens] was able to continue performing [her] job well is not dispositive, as the defendants suggest. Interference with work performance is only one factor among many in the calculus", and "[r]esilient employees who manage to perform well in trying circumstances may still prove a hostile environment claim.")*; see also Robinson v. Perales*, 894 F.3d 818. 830 (7th Cir. 2018); *Dandy*, 388 F.3d at 271.

Defendants also say that operational reasons compelled Chief Hyland to allow Kara to swap onto Ross's shifts beginning in 2017, essentially arguing that decision

was a legitimate and non-discriminatory reaction to workplace dynamics that were outside of Chief Hyland's control. The facts to support that argument, however, are largely undeveloped in the summary judgment record. Defendants do not explain, for example, why Chief Hyland was forced to allow Kara to resume trading onto Ross's shifts in the spring of 2017 when Chief Patterson was able to manage the department to prevent that from happening from 2013 to 2016. There also is nothing in the record to show whether or how the operational challenges facing Chief Hyland were materially different than those facing Chief Patterson when he was able to manage the fire department without permitting Kara to swap onto Ross's shifts. In addition, neither side develops whether Chief Hyland's concern with complaints from other firefighters or that Kara would file a grievance over the issue are legitimate reasons to require Ross to work with Kara when he was racially harassing Ross. Moreover, the record supports the inference at this stage of the proceedings that Argonne and Chief Hyland understood, just as Chief Patterson understood, that it was not optimal for Ross and Kara to work on the same shifts given Kara's racial animosity toward Kara.

Ross is required only to demonstrate that the harassment he was subjected to "unreasonably interfered with" his "work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being." *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 476 (7th Cir. 2004); *Hildebrandt v. Illinois DNR,* 347 F.3d 1014, 1035 (7th Cir. 2003) ("Harassment in the context of Title VII involves conduct that unreasonably interferes with a person's

work performance, or creates an intimidating, hostile, or offensive work environment.") (citations omitted). Based upon the racially charged content of Kara's remarks and threatening conduct, a reasonable juror could infer that the remarks and conduct affected Ross's psychological well-being. Ross testified that he was severely shaken by Kara's conduct, an account this Court must credit at summary judgment. PASOF ¶ 38; Ross Deposition [ECF No. 145] at 172:3–4; Ross Declaration [ECF No. 149-12] at ¶ 3.

Ross's work performance may not have been as directly or negatively impacted by Kara's and Chief Hyland's allegedly discriminatory conduct in this case compared to other cases, but that question of degree is for the jury and not to be decided as a matter of law. The record here adequately supports Ross's argument that his work performance and environment were impacted by Kara's and Chief Hyland's conduct in that, among other things, he was forced to call in sick or not work on certain days that Kara swapped onto his shift and, on days they did work together, Ross was unable to sleep in the firehouse during his shift out of fear about what Kara might do to him. Ross Declaration [ECF No. 149-12] at ¶¶ 3, 4.

Defendants cite no cases in which courts have granted summary judgment in a hostile work environment case under facts closely analogous to those of record in this case. The cases Defendants cite in support of their motion are sufficiently distinguishable on their facts as to provide little support for the notion that Defendants are entitled to summary judgment as a matter of law. Defendants often cite cases for broad legal principles, but the facts in those cases do not support

Defendants' position that summary judgment is appropriate here. For example, Defendants cite *Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 988 (N.D. Ill. 2016), for the proposition that "federal law does not protect against petty slights, minor annoyances, and bad manners." That legal maxim is correct. But the plaintiff in that case claimed discrimination based on facts that, in the Court's view, are markedly different than the facts alleged by Ross. The plaintiff in *Adams* alleged that "(1) the other interns excluded her and acted in a demeaning manner towards her; (2) Cummings grabbed her hair and touched her skin; (3) Witt screamed at her; (4) Cummings and Witt suggested she apply for the African American Leadership Council to the exclusion of other opportunities; and (5) she was demoted from "intern" to "volunteer."" *Id.*

The other cases Defendants cite where summary judgment or a motion to dismiss was granted similarly are distinguishable on their facts. *Patt v. Family Health Sys.*, Inc., 280 F.3d 749, 754 (7th Cir. 2002) (eight gender-related comments made by a supervisor during the course of her employment spanning 5 years or more); *Lilly v. Roadway Express*, 6 Fed. App'x. 358, 359 (7th Cir. 2001) (a comment by one coworker to another that he looked like a "starving Ethiopian," coworkers' use of the racial epithet "[n***]" outside of plaintiff's presence, and one coworker's stray reference to plaintiff as a "black ass" during a meeting plaintiff did not attend); *Mercer v. Cook County*, 527 Fed. Appx. 515, 520–22 (7th Cir. 2013) (a supervisor and a fellow correctional officer bumped into plaintiff, coworkers made sexually offensive comments to the plaintiff, sexually explicit graffiti was discovered in a unisex

bathroom and promptly removed, and a fellow correctional officer said he had a bullet with the plaintiff's name on it); *Winters v. Hamos*, 2018 WL 3458266 (N.D. Ill. 2018) (plaintiff was denied training, did not receive performance reviews or received baseless poor reviews, was given an excessive workload, denied Flex Time, suspended for seven days, as well as other comments that were not overtly discriminatory); *Lee v. Styrolution America LLC*, 2013 WL 788204 (N.D. Ill. 2013) (repeatedly calling the plaintiff "boy" and threatening to beat and hang the plaintiff after he killed a spider at work); *Triplett v. Starbucks Coffee,* 2011 WL 3165576 (N.D. Ill. 2011) (a comment from a supervisor that there were not as many black people in Boston as in Chicago, the implementation of a store policy requiring Chicago Transit Employees to buy something before being allowed to use the restroom at Starbucks, and two allegedly race-based disciplinary decisions); *Wimberly v. AutomotiveMastermind*, Inc., 2021 WL 2043623 (S.D.N.Y. 2021) (generic allegations that the plaintiff was subjected to disproportionate scrutiny, and another Black employee, not the plaintiff, was referred to as a "ghetto motherf*****").

In the final analysis, all cases ultimately are tied to and depend on their unique facts as viewed through the prism of applicable law. Kara's and Chief Hyland's alleged conduct in this case is sufficiently severe or pervasive in the Court's view to allow Ross to make his case to a jury. *Thomas v. CEDA*, 2014 WL 3360602, at *2 (N.D. Ill. 2014) ("When deciding a motion for summary judgment, a court construes all reasonable inferences and resolves all evidentiary conflicts in the light most favorable to [the non-moving party]."); *Patt v. Fam. Health Sys., Inc.,* 280 F.3d 749,

754 (7th Cir. 2002) (citing *Russell v. Board of Trustees of the Univ. of Ill.,* 243 F.3d 336, 343 (7th Cir.2001) ("When assessing a hostile work environment claim, we look to all the surrounding circumstances, including the frequency of the harassing conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.")). "If a reasonable jury could find that the conduct was severe or pervasive, then the claim must go to trial." *Gates*, 916 F.3d at 640. A reasonable trier of fact could find Kara's and Chief Hyland's conduct severe or pervasive, and so summary judgment cannot be granted on the record now before the Court.

### C. Employer Liability

The question of employer liability turns, at least in part, on whether the harasser is the victim's supervisor or coworker. *Paschall,* 28 F.4th at 813. "When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004) (citing *Parkins v. Civ. Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998)). When a coworker is the harasser, "[t]he employer is liable…only when the employee shows that his employer has 'been negligent either in discovering or remedying the harassment.'" *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000) (quoting *Parkins*, 163 F.3d at 1032). Here, Chief Hyland was Ross's supervisor and he is alleged to have contributed to the severe or pervasive hostile work environment described above. *See, e.g.,*

*Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 268–69, 275, 277 (6th Cir. 2009) (holding that a reasonable jury could find that the employer's response to coworkers' harassment was unreasonable where a supervisor "participated in some of" the conduct). As for Kara's race-based conduct and Argonne's potential negligence in either discovering or remedying that harassment by a co-worker, Ross testified in his deposition, and Chief Hyland himself acknowledged, that Ross complained about Kara calling him a "Black Mother Fu**er" and other incidents, but no action was taken because Chief Hyland looked into those complaints, "asked [Ross], were there any witnesses, was anybody else there…but none of those ended up having anything to them." Hyland Deposition [ECF No 145] at 46:6–17.

A reasonable jury could find that Chief Hyland's actions in investigating Ross's complaints about Kara but dismissing them for lack of corroborating evidence do not constitute "reasonable steps to discover and rectify acts of…harassment of its employees" under the circumstances of this case. *Parkins*, 163 F.3d at 1032. Chief Hyland knew there were issues of a racial character between Kara and Ross, but he did little to address or attempt to rectify that situation. Chief Hyland was aware of the 2013 puppet incident and perceived it to be such a serious breach of workplace decorum that he said he would have fired Kara if he had been fire chief at the time. Yet he exclaimed, after he became fire chief, "that Black son of a bitch is not running the fire Department" with reference to Ross's requests that Kara not be allowed to work overtime on his shifts, and his responses to Ross's complaints in 2017 and 2018 were not effective in stopping Kara's campaign of race-based harassment. Chief

38

Hyland's ineffective responses, while not dispositive, also are relevant to whether his responses were reasonable. *May v. Chrysler Grp.,* 716 F.3d 963, 971 (7th Cir. 2013) ("[S]uccess or failure [in] stopping the harassment does not determine whether an employer is liable. Nevertheless, the efficacy of an employer's remedial action is material to a determination whether the action was reasonably likely to prevent the harassment from recurring.").

## CONCLUSION

For all the above reasons, Defendants' Motion for Summary Judgment [ECF No. 142] is denied. It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge


Dated:    March 31, 2023